[L. A. No. 15762. In Bank.—August 23, 1937.]

IRENE HERBERT, Respondent, v. DORIA C. LANKERSHIM et al., Executors, etc., Appellants.

J. Wiseman Macdonald, *in pro. per.*, Edward M. Auslender, Loeb, Walker & Loeb, Irving M. Walker, Milton H. Schwartz, Herman F. Selvin and John W. Preston for Appellants.

Swaffield & Swaffield, Kenneth Sperry and Joseph E. Madden for Respondent.

SEAWELL, J.—J. B. Lankershim, commonly known as Colonel Lankershim, a resident of the city and county of Los Angeles, state of California, died testate on October 16, 1931, at the city of Brooklyn, state of New York. He left a large and valuable estate. J. Wiseman Macdonald and Bank of America National Trust and Savings Association

were appointed special administrators, with general powers as to the management of his estate.

By paragraph IV, count one, of the complaint, denominated "Complaint—Money on Contract", plaintiff alleges:

"That during the lifetime of said decedent and on the 10th day of October, 1927, said deceased J. B. Lankershim at and in the city of Los Angeles . . . in consideration of and on account of services rendered by plaintiff to and for J. B. Lankershim at his special instance and request, at divers times and occasions between January 4, 1924, and January 1, 1928, as a companion to him and in reading to him, administering to his wants; caring for his welfare; preparing food, meals and delicacies for him; attending to and caring for his wearing apparel and linen; aiding and assisting him in dressing and undressing and other activities of life; protecting him from artful and designing persons; consoling and sympathizing with him in times of worry, anxiety, displeasure and disappointment; nursing and administering to him in times of sickness and ill health; preparing and administering medicines and other treatment as directed by physicians or desired by him and otherwise caring for and administering to his comfort, contentment, welfare, happiness and pleasure, made executed and delivered a certain instrument in writing," which is marked "Exhibit 1", of which the accompanying photoprint is a facsimile. *(See reproduction on page 418.)*

Said instrument was presented to said special administrators for payment in the form of a creditor's claim on August 1, 1932, and it was rejected on August 25, 1932. It was made a part of count one by reference.

For a separate and second cause of action plaintiff alleges that the decedent for a valuable consideration made, executed and delivered to plaintiff said written instrument and prays for judgment in the sum of $500,000, together with interest thereon as provided by law, and that the same be paid from the estate of J. B Lankershim in due course of administration, and for appropriate relief in the premises.

In both counts of the complaint the kind of services and the period of time in which they were performed are definitely alleged.

Doria C. Lankershim and John I. Lankershim, children of the decedent, and J. Wiseman Macdonald, the executors named by the decedent in his will, were, in due course, substituted as parties defendant in the place and stead of said special administrators. J. Wiseman Macdonald was a trusted and close personal friend of the deceased and had been his legal and business advisor for many years prior to his death.

On October 10, 1927, the day the disputed instrument bears date, the decedent was seventy-seven years of age and the members of his family then living were his wife, Caroline A. Lankershim, and the son and daughter, answering defendants herein. The plaintiff was at said time the wife of Edres Herbert and was approximately thirty-eight years of age.

Decedent executed his will on March 29, 1929, some seventeen months subsequent to the date which said questioned instrument bears. He died October 16, 1931, and his will was admitted to probate on December 14, 1932. He made no provision for nor mention of plaintiff in said will.

Decedent's wife predeceased him by three years and a few months. The son, daughter and J. Wiseman Macdonald, executors, deny at length and in detail the genuineness of said instrument bearing date October 10, 1927, and allege by way of separate and affirmative defense matters which are absolutely opposed to and directly tend to refute the *bona fides* of plaintiff's claim. It is admitted by plaintiff that she wrote all the written matter constituting the questioned instrument except the name "J. B. Lankershim". It is also admitted that the ink lines drawn through certain printed

words and figures and such interlineations and changes as appear upon the face of said instrument were made by her. Appellants insist that the instrument itself presents physical features which unmistakably bear witness that a number of changes and alterations were made after the name of "J. B. Lankershim" was appended to it, and that the several physical changes which stand unexplained invalidate the instrument. (Sec. 1982, Code Civ. Proc.)

It is argued that the face of the instrument is self-accusatory and the doubts and uncertainties which it creates, and the incongruous situation which has been produced by the alleged transaction, are not consonant with the gravity or enormity of the transaction, nor agreeable with any sensible business method which a person of Colonel Lankershim's business experience and training would adopt for the accomplishment of a much less important transaction. In other words, it is contended by the executors that under no rule of rational conduct can it be concluded that a man who possessed the business sagacity which respondent attributes to Colonel Lankershim would have adopted a plan or scheme of transfer involving a large fortune which held within its basic construction elements which would obviously and inevitably furnish potential grounds of attack, such as are here made upon it.

The executors stress the fact that the signature "J. B. Lankershim" is divided into three parts, none of which are in alignment, and contend that it was written by a hand tremulous with age and inadequately directed by seriously impaired vision; that at a time when waning faculties had rendered him unable to resist the wiles and importunities of designing persons, a state of superannuation in which respondent herself had placed him, she obtained his signature by deceit and misrepresentations as to the true nature of the instrument, if, indeed, anything at all was written on the paper at the time his name was subscribed to it. That he relied upon others to read to him is firmly established by witnesses on both sides of the case. Plaintiff herself in her creditor's claim incorporates "reading to him" as constituting one of the assignments of employment upon which she predicates her claim for compensation.

Appellants' answers are pleaded in both categorical and conditional forms. They direct attention to the fact that all of the printed portions of the instrument were in the form of

a check or draft, and the portions that were marked out of the instrument by plaintiff were marked out without the knowledge, consent, approval or ratification of decedent, and none of the printed portions left remaining were read to him, and contend that said printed words were left therein without the decedent's knowledge, and without instructions from him to leave said printed matter in said instrument, and it is, therefore, no part of said instrument.

The genuineness of the signature is denied on information and belief, but it is alternately alleged that if the signature is genuine, all of the written matter contained in said instrument was written after the signature of the decedent had been affixed to a check or draft and signed by him in blank as a matter of business convenience, made accessible to respondent by reason of the existing close personal and confidential relations which respondent fully describes in her verified claim filed herein. The other alternative suggested is that his signature was procured by misrepresentations as to the character of the instrument made to him when his signature was obtained.

The claim that the body of the instrument was either written *in toto* after signature, or was originally in form a draft or check in the sum of $500 and was thereafter altered and added to, is based chiefly on the close crowding of the words on the line on which the signature is written, and particularly on the fact that the word "me", next preceding the signature, is forced upward and out of line to prevent it from overlapping the signature. Other physical characteristics are pointed out as being wholly contradictory of and inconsistent with the claim that the matter which respondent wrote on the blank check truly recorded his dictation or expressed his wish.

By separate answer it is alleged that if said decedent executed and delivered said instrument, no consideration or benefit of any kind whatsoever passed to said decedent for its execution and delivery; that if any consideration passed from plaintiff to decedent on account of the making and delivery of said instrument, such consideration was grossly inadequate and it did not amount to more than a trifle in a transaction involving a half million dollars; that the procurement of that vast sum for such grossly inadequate consideration constituted a fraud practiced upon him.

It is affirmatively alleged by the answering executors that plaintiff became acquainted with the decedent about the month of January, 1924; that he was then past the age of seventy-three years and plaintiff was of the age of about thirty-five years; that she was then a married woman, the wife of Edres Herbert, and was then presumably residing with her husband in the city of Long Beach, county of Los Angeles, and said plaintiff herein and said Edres Herbert were at all times husband and wife; that on January 4, 1924, and for many years prior thereto, decedent resided alone at the Hotel Biltmore, in the city of Los Angeles; that during the period covered by the transaction herein set forth, plaintiff and decedent were on very friendly terms.

Said executors further allege that during all of the period from January 4, 1924, to October 10, 1927, decedent was in a weakened and debilitated condition and was being massaged and was receiving physical treatment from a professional masseur who was in daily attendance upon him at the Biltmore Hotel; that on October 10, 1927, decedent was past seventy-seven years of age, and he then was and for several years immediately prior thereto had been suffering from debilitating illnesses which had progressively increased with advancing years, thereby impairing his mental force and vigor to the degree that he was easily influenced by those who had gained his confidence; that decedent's eyesight had failed to the extent that on October 10, 1927, if able to read at all, it was only with the aid of powerful lenses, and that at all times herein plaintiff was familiar with decedent's physical and mental infirmities. A condition of atrophied impairment of the optic nerve of decedent's eyes will later receive attention.

It is further alleged that plaintiff, having formed the intent and purpose of obtaining from decedent a large sum of money, and being a woman thirty-eight years of age, and possessing an attractive personality and ingratiating manners, wove herself into his kindly favor; that she visited him socially on frequent occasions at his rooms at the Hotel Biltmore, and at decedent's expense she accompanied him to theaters and took many meals with him; that she performed petty acts of service, many of which were unnecessary, and all of them were done for the purpose of winning his trust and confidence and to assist her in gaining a dominating influence over him to the end that she might carry out her purpose of obtaining

from him a large sum of money; that by the indulgence of blandishments and by doing the foregoing acts she succeeded in making him believe that she was fond of him, and was anxious to help him, and that he needed her assistance, all of which was untrue, and she thereby gained his trust and confidence; that plaintiff was a woman possessing considerable mental force, and decedent, having entered a state of progressive mental and physical disintegration, became dependent upon others in domestic and business matters, and plaintiff, taking advantage of his increasing weakness, exercised her power over him to the degree that she was able to dominate him to a marked degree and substitute her will for his will.

In furtherance of her said plan, on or about the middle of August, 1927, she left her Long Beach home and rented living quarters in the Engstrum Apartments in the city of Los Angeles, situated near the Hotel Biltmore, where decedent resided. It is further alleged that by her persuasion he gave up his apartments at the Biltmore Hotel, where he had made his home for a number of years, and on September 1, 1927, moved to an apartment at the Engstrum, selected by plaintiff, on the same floor and directly across the hall from the apartment occupied by plaintiff; that plaintiff visited decedent's apartment several times each day; that on the day the said instrument is alleged to have been executed she falsely and designedly, with the purpose of unduly influencing him, represented to decedent that she was his only real friend, and that she had done more for him than his children had done, and he ought to make her comfortable because of all her acts of kindness, all of which representations were false, but believed by decedent to be true; that while he was at said Engstrum Apartments plaintiff influenced him to deny himself to · his friends, other than such visitors as she elected that he might see.

The answer alleges that before signing, or at the time of signing said instrument, if in fact and truth he actually signed it, in its present form or otherwise, the decedent consulted no attorney or friend, and did not advise with anyone as to its terms or effect, and that it was not the voluntary act of decedent, nor did it express his wish or will, but said instrument is the product of false representations and of undue influence which she brought to bear upon his will.

Defendants further allege that if decedent did in fact place his signature on said instrument, he was induced so to do

by the representations of plaintiff that said instrument was a check or promise to pay to plaintiff $500 and no more, and that the fifth cipher was thereafter added by respondent in an attempt to convert the figures $500 into $500,000.

In physical appearance, the fifth cipher indisputably differs quite pronouncedly from the other ciphers in size, pen pressure, formation and color intensity. Evidently a blotter was applied immediately after it was made. The spacing between it and the cipher next to it is much greater than the spacing between any of the other ciphers. It is raised above the ruled line, and corresponds in alignment with the two ciphers which constitute the figures "500", after which there is a period and two other ciphers, which, defendants claim, was the true and original amount before it was changed by plaintiff from $500.00 to $500,000. The lower loops of the last two ciphers, denoting cents, drop below the ruled line, thereby differentiating them in alignment from the ciphers admittedly standing for dollars, while the alleged added cipher and the two ciphers expressing the amount in dollars, two spaces removed to the left, are in alignment; that is, all three are equidistant above the line. In other words, the two ciphers underscored, representing "00" cents (provided the amount is to be read $500.00), drop below the ruled line, whereas the two ciphers immediately to the left of said ciphers are in alignment with the figure "5" as in $500. The physical fact cannot be disputed that if a blinder is placed over the disputed cipher, which appears some distance to the right of the fourth cipher, the amount is $500.00. The point after the second cipher is undoubtedly a period.

The contentions of the executors made on appeal, briefly stated, as to the instrument itself are: (1) that the signature of the deceased was obtained by trick or device, or his signature was affixed to the instrument in blank and the plaintiff thereafter surreptitiously obtained the same and wrote all that appears thereon; (2) that the instrument as originally written provided for the payment of $500, and some time thereafter plaintiff fraudulently changed it to its present form; (3) that the large sum is accounted for on the theory that it was not possible, without creating telltale evidence of the erasure of the *period*, to raise it to any other or intermediate sum below $500,000; (4) that the words "thousand dollars", and the insertion "one month" after the fifth cipher, and the changing of the year 1927 to 1924, and the whole of

the closing lines beginning with "kindness", constitute proof that the changes were made long after the signature of the decedent was written on the instrument.

It is a further allegation of the executors that whatever attention or courtesies were shown the colonel by her were done for the purpose of cajoling him by delusive flattery into the belief that his welfare was a matter of deep concern to her; and that she made no suggestion to him that she intended to make a charge against him or his estate for any of the services to which she now lays claim. Section 337, subdivisions 1 and 2, and section 339, subdivision 1 of the Code of Civil Procedure, are pleaded as bars to plaintiff's action. The foregoing sets forth in substance the issues as framed by the pleadings.

The jury returned a verdict in favor of plaintiff for the sum of $500,000, the full amount demanded, with interest at the rate of 7 per cent per annum from November 16, 1931. Judgment was ordered entered in plaintiff's favor in accordance with the jury's verdict, including the costs of trial. The amount of the judgment, including interest, now approximates $700,000. The defendants have appealed to this court from an order denying their motion for judgment notwithstanding the verdict of the jury, and from the judgment in favor of plaintiff and against the defendants. The appeal is presented on an engrossed bill of exceptions.

Many assignments of error are set forth by appellants as to certain instructions given on behalf of respondent, and the refusal to give a number of instructions requested by appellants on matters of law necessary for the guidance of the jury, also undue limitation of cross-examination of plaintiff's chief witnesses, and as to numerous errors made in admitting evidence over the appellants' objections, and excluding material evidence offered by appellants, greatly to their prejudice. Other rulings are complained of, but only such rulings as are of major importance will receive consideration.

The transaction in its inception, development and final consummation, as told by the witnesses for the respondent, presents an extraordinary proceeding. It is earnestly insisted by appellants that no reasonable deduction can be made from the testimony of respondent's witnesses other than that respondent planned to acquire, with the cooperation of her associates, a large part of the decedent's estate, the plan to

be executed in secrecy and known only to a coterie of her intimate friends and associates who were unquestionably active in assisting her cause. The age, physical incapacity and failing mental powers of the decedent, which are made apparent by the transaction itself (conceding that he performed the alleged acts in the manner claimed by respondent), and other circumstances shown at the trial, including the confidential relations which are clearly shown to have existed between said parties by the case made out by the respondent herself, and the inadequacy of any consideration that the decedent may have possibly received from respondent, make it the duty of a reviewing court to scrutinize the transaction searchingly.

This rule has been announced in various forms by this and other courts. A concise statement of the rule where the relations between the parties were intimate and highly confidential, as here, and where the donor had no independent advice, and where the conveyance was without valuable consideration, or, it may be parenthetically added, in cases where the consideration is grossly inadequate, is announced as follows in *Mead* v. *Mead*, 41 Cal. App. 280, 285 [182 Pac. 761, 763]:

"Under such circumstances, the decisions hold uniformly that the transaction resulting in benefit to the trustee should be viewed with 'the most scrutinizing jealousy' and that the presumption of fraud attaches, and must be overcome by evidence that the deed is what it purports to be." (Citing a long list of authorities.)

Paraphrasing the language used in *Cox* v. *Schnerr*, 172 Cal. 371, 378 [156 Pac. 509, 512], it may be said that "plaintiff herself furnished proof of the utmost trust and confidence reposed in her by Colonel Lankershim". It is there further said: "The burden of proof usually rests upon the person asserting fraud, but when one bases a claim upon a contract obtained from a person to whom he stands in a relation of trust and confidence, it becomes his task to prove that he exhibited that *uberrima fides* which removes all doubt respecting the fairness of the contract. . . . It applies in every case 'where there has been a confidence reposed which invests the person trusted with an advantage in treating with the person so confiding'. (2 Jones on Evidence, edition of 1913, sec. 190.)

"In every transaction of this kind, one who holds such confidential relation will be presumed to have taken undue advantage of the trusting friend, unless it shall appear that

such person had independent advice and acted not only of his own volition but with full comprehension of the results of his action. (*Ross* v. *Conway*, 92 Cal. 632, 635 [28 Pac. 785]; *Darlington's Estate*, 147 Pa. St. 624–631 [30 Am. St. Rep. 776, 23 Atl. 1046]; *Firebaugh* v. *Burbank*, 121 Cal. 186–191 [53 Pac. 560]; *Piercy* v. *Piercy*, 18 Cal. App. 751–756 [124 Pac. 561]; *Odell* v. *Moss*, 130 Cal. 352, 357 [62 Pac. 555].)''

The rules of law as announced in the above cited cases and in many others of this state furnish the criteria or tests which must be applied to the issues of fiduciary and confidential relations which have been indisputably shown to have existed between respondent and decedent, Colonel Lankershim. Whether undue influence will be presumed or inferred from the relationship as described by the evidence is a matter which necessarily involved the proposition as to whether the instructions given by the court sufficiently covered the issue of undue influence, or were as full, direct and explicit on that issue as the appellants were entitled to have given in the circumstances of the case. We will later consider that question in our discussion of the sufficiency of the instructions.

We will next give consideration to the testimony of the four experts who were called to testify in the case. Two were called as experts in handwriting and photographic art in its highest form of development, as a means of distinguishing the genuine from the counterfeit, and two were experts in the restoration of deleted and changed texts, one of whom made chemical analyses and other tests as to the kind and color of inks used in the production of the questioned document. All of them apparently brought to their aid all that science and chemical knowledge of the subject afforded. Albert S. Osborn, lecturer at the United States Bureau of Investigation at Washington, D. C., and a nationally recognized authority on handwriting and disputed documents, and James Clark Sellers, a lecturer at the University of Southern California, and an expert examiner and photographer of questioned documents, also a widely known authority in his special lines which embrace the subjects of inks, dyes, ink absorptions, and the determination of whether writings which cross creases made by the folding of papers were done after the instruments had been folded (as was contended by all the experts in the instant case) or were done before the creases were made by folding, and also offered as an expert as to alterations made in documents since originally written, were the two witnesses

called by the appellants. Dr. Lodewyk Hendrikson, head of the photechnical department at the Huntington Library and Art Gallery at San Marino, whose special work is the reproduction and the examination of documents, and the restoration of texts which have been deleted, changed or altered, and Professor Brinton, head of the department of analytical chemistry at the University of Southern California, and who formerly occupied chairs as teacher and lecturer at the University of Paris, the University of London and the University of Minnesota, were specially selected by the court (Code Civ. Proc., sec. 1871), and gave testimony as to the integrity of the questioned document. All four were definitely of the opinion that the signature, J. B. Lankershim, was not written at the same time, with the same kind of ink, or under the same writing conditions or circumstances as other parts of the instrument were written. The experts in handwriting were of the opinion that the last cipher in "$500,000", and other specified parts of the instrument, were not written at the same time that the body of the document was written, and that the ink coloring was different and stated particulars.

The highlights of the opinion evidence given by the experts called by the appellants and selected by the court (none were called by respondent) may be briefly summarized as follows: The signature, J. B. Lankershim, was written before the body of the instrument was written; the shade of color of the ink is different in certain designated words from the shade of others; discs, or small particles of cakes caused by the drying of ink upon the pen are discernible in the lines of the first letter, initial "J", in the signature, which do not appear elsewhere in the writing of respondent; the shade of color in the signature is different from the other writing; the instrument had been folded before the body of the document was written, as shown by the spreading of ink as it crosses the creases made by folding; in some instances the ink, where the writing crosses the fold, penetrates to the back of the instrument; a splash of ink is discernible on the right side of the letter "H" where it crosses the fold line as the pen was caught in broken fibre made by the fold; the date line at the bottom, "Jan. 4, 1924", was originally written 1927, and two figure fours were afterwards superimposed upon the numeral "7" in an effort to convert it into "4"; the word "me", next in position to the letter "J", was given an upward slant to avoid writing into the letter "J", which constitutes the

first letter of the signature; "one month", the word "me", and the fifth cipher of "$500,000" were blotted, and no blotter was used on any writing near by or elsewhere; if all parts of the instrument had been written at the same time, other words in close proximity to the blotted words and cipher would also show ink absorptions; the letters forming "Five hundred" are either generally vertical in position or slant to the left of a vertical line, whereas the words "thousand dollars" immediately following said words and which are claimed by the experts on penmanship to have been written at a subsequent time, slant to the right; the words comprising the sentence "kindness and protection to me", which are written below the printed words "value received and charge to account of", are closely crowded together.

Other questions as to word and letter spacing, pen pressure, slanting of letters, arrested and cramped arm motion, differences as to the lightness and heaviness of ink fluids, and ink blurs, which may be readily observed by an inspection of the instrument, are discussed at great length. It is appellants' contention, supported by expert testimony, that if decedent knowingly signed his name to the draft or check, it was written as a straight check for $500.00, and all that appears upon its face tending to transform it into a $500,000 obligation was written without the consent or knowledge of the decedent. The photographic copy of said instrument is herein reproduced. It shows generally the physical things which form the basis of the experts' opinions, except as to a faint crease made by folding the paper a second time at a point midway between the crease running through the center from top to bottom and the left edge of the document.

Appellants stress the point that the testimony of the experts is uncontradicted in the main, and in this particular their contention in some respects is borne out by physical facts appearing upon the face of the instrument which are brought directly to the attention of this court for scrutiny. Such evidence cannot be arbitrarily ignored or nullified by the jury's verdict based upon the testimony of a single witness as to the execution of said instrument, if the testimony of said witness contains within itself such evidentiary weaknesses and abnormalities as to render it too unreasonable and inherently improbable to support the judgment, particularly in the light of the facts of this case, which, under all authority, must be jealously scrutinized.

Plaintiff's case rests in no small degree upon alleged oral admissions made by decedent against interest. The only evidence which can be regarded as corroborative of Miss McKee's testimony as to the execution of the disputed document is the instrument itself, admittedly in the *handwriting* of the plaintiff to which the decedent's name is attached. Appellants insist that her testimony as to the production of the instrument is impeached by the inherent improbabilities which confront it and by the instrument itself in the circumstances of the case. ■ On the subject of oral admissions, unless corroborated by *satisfactory* evidence, this court, in the *Estate of Emerson,* 175 Cal. 724, 728, 729 [167 Pac. 149], rates it as the weakest of testimony that can be produced. Lord Romilly, master of the rolls, in *Crouch* v. *Hooper,* 16 Beav. 182, made the following observations as to this kind of testimony: " 'It is always necessary to remember that in these cases, from the nature of the evidence given, it is not subject to any worldly sanction, it being obviously impossible that any witness should be convicted of perjury for speaking of what he remembers to have been said in a conversation with a deceased person.' Therefore, proceeds the learned judge, he has never experienced any difficulty in rejecting and disregarding such evidence." The decision points out that the position or interest of such witnesses may be so patent as to make it " 'the duty of the court to examine their testimony with a jealous care and to scan it with a watchful scrutiny. They are masters of the situation and swear without fear of contradiction. The safe administration of justice demands that in such a case there should be either *satisfactory* corroborative evidence, or that the evidence of the living party should be so full and *convincing* as to persuade the court of its entire truth.' And, finally, the text-writers show that the courts are all in accord in thus weighing such evidence, and here suffice it to cite 2 Moore on Facts, secs. 877, 1150 and 1166; 1 Taylor on Evidence, sec. 648; Wigmore on Evidence, secs. 578, 2065." (Italics ours.) (*Estate of Emerson, supra.*) In support of the above text, section 2061, subdivision 4 of the Code of Civil Procedure; *Mattingly* v. *Pennie,* 105 Cal. 514 [39 Pac. 200, 45 Am. St. Rep. 87]; *Austin* v. *Wilcoxson,* 149 Cal. 24 [84 Pac. 417], are also cited. It is also urged that plaintiff's case is founded on coincidence, fortuitous circumstance and unusual incidents or events which have neither a natural or logical beginning nor sequence, and are at variance with the rational

conduct of a person who had in contemplation a transaction of the kind, importance and magnitude of the one under examination.

It is pointed out that it is the duty of courts, in the examination of cases of the nature of the one before us, not only to inquire into the confidential relations existing between the parties involved, but also to carefully scrutinize the purposes and intent which likely motivated the party who would become excessively enriched by the accomplishment of a grossly uneven bargain. It is insisted with much force that in view of the relations which existed between the principals to the controversy and the nature and magnitude of the transaction, in the light of the evidence disclosed by the record, due respect to and regard of the laws which direct human conduct, particularly as applied to persons highly trained in business affairs, render the case made by respondent too weak and insubstantial to support a judgment grossly in excess of the value of any services respondent had the ability to perform or of which the decedent was in need.

The evidence upon which respondent relies to sustain her judgment, and which appellants most vigorously assail, was given by Miss Stella McKee, a close friend and companion of respondent for a number of years. Like Mrs. Herbert, she resided at Long Beach, where their relations had been very intimate for several years. She accompanied Mrs. Herbert to the lawyer's office during pre-trial days and at the trial of the case, and, no doubt, counseled with her. Mrs. Herbert had lived in her apartments at Long Beach, and she was acquainted with Mrs. Herbert's husband. The witness of equal importance to Miss McKee, and who was most active in promoting a relation of companionship and personal friendship between Mrs. Irene Herbert and Colonel Lankershim, was Mrs. Adele Blood Hope. After leaving Long Beach Mrs. Herbert occupied, at various times, apartments rented by Mrs. Hope. Mrs. Hope originally introduced and brought together Mrs. Herbert and Colonel Lankershim. Her activity in Mrs. Herbert's interest appears from her own admissions. She afterwards met her on several occasions and under various circumstances at the Biltmore Hotel in the apartment of Colonel Lankershim.

Miss McKee, at the time of trial, testified that she was then employed as a cashier in the public utilities department at Long Beach, had formerly been employed by a Long Beach

bank as teller or cashier, but was without employment after July, 1927; that she was a visitor on five or six occasions at the apartments of the colonel upon invitation of her friend, Mrs. Herbert. She partook of meals and attended a picture show or theater frequently as the guest of the colonel, and partook of his hospitality very freely. Because of his failing eyesight, theater seats were never further from the stage than the second or third row. He said he "had to sit close to the stage". Frequently he would leave the theater before the picture or program was more than half completed. The numerous dinners which the witness and other mutual acquaintances and friends of Mrs. Herbert enjoyed at the Biltmore Hotel were served in the colonel's apartments. He paid all bills. He seemed generous in hiring taxicabs and placing his automobile at the disposal of his female guests, both for use within the city and for beach and long distance trips. Miss McKee, who testified that she was in the colonel's room at the time the disputed instrument is claimed to have been written, said, in explaining her presence, that a few days before October 7, 1927, she received a letter at Long Beach from Mrs. Herbert, who reminded her that her (Miss McKee's) birthday fell on October 7th, and invited her to attend a birthday party which she wished to give in celebration of the occasion at her apartments at the Engstrum Apartments, where she was stopping. The witness answered, accepting the invitation.

In her deposition, taken some five months before she testified in the case, she stated that she did not attend on the day set, as her duties at the bank would not admit of her attendance. Her attention being called to the fact that she had not been employed at the bank since the month of July preceding, she admitted error, but was unable to recall the circumstances which prevented her attendance on the seventh. She did arrive from Long Beach on the evening of the ninth of October. She took dinner in Mrs. Herbert's room, Colonel Lankershim being present, and remained overnight with Mrs. Herbert. Upon arising in the morning Mrs. Herbert prepared breakfast for the three. Between 9:30 and 10 o'clock she and Mrs. Herbert entered Colonel Lankershim's apartments, which were across the hall from Mrs. Herbert's room. Mrs. Herbert carried a tray containing muffins, some fruit, coffee, tea, sugar and cream. Evidently their entry into the colonel's apartment was an unexpected visit. The colonel was lying on his bed and was attired in his dressing robe and had on slippers.

He took his breakfast reclining on the bed while Miss McKee and Mrs. Herbert ate from a small table which they had set.

After breakfast the colonel complained that the masseur employed to attend him had not arrived. He was disappointed and annoyed that the masseur was not there to perform a duty he was hired to perform. He said that Irene had never failed him. Mrs. Herbert then suggested that she do something for him and she began to rub his arms, the back of his head and neck, and to put cold compresses over his eyes. In her deposition Miss McKee had averred that the colonel complained of feeling tired and said his eyes were bothering him. She contradicted this statement at the trial and testified that he said nothing about his eyes bothering him or feeling tired, but when they entered he said he was feeling fine.

According to the witness he was lavishly profuse in his praise of Mrs. Herbert. He complimented her for the perfect manner in which she had cooked the prunes, and the muffins and the coffee were just to his liking. He said, "Irene, you know how to cook meals to suit me." He further said she was always thinking of the things he liked and preparing them as he liked them; that she did more for him than anybody in the world, even his own children; all the little things she did meant very much to him; that he was never disappointed in Irene; she had an understanding mind and knew what he liked and when he wanted a thing done she did it. He spoke of her kindness and thoughtfulness of him, and how necessary she was to him. When she had finished rubbing his arm and head, he said: "Now, I am going to make good the promise I made you. I am going to pay you well for your services." He arose from his bed and went to a dresser, took out a piece of paper, and said: "I want you to write what I am going to dictate."

The witness then recalled that he dictated "something like this". She then repeated *verbatim*, even as to the order and arrangement of each word and sentence, the verbage appearing in the body of the written instrument which she had heard dictated but once and had not seen or heard discussed by anyone during a period of nearly six years. She and Mrs. Herbert had lived within that period in the same apartments for some time and at one time were interested in a common business enterprise. They had resided within a half block of

each other at Long Beach for quite a period and had been close friends and companions for a number of years, but at no time did she or Mrs. Herbert even hint at or mention the existence of the instrument, notwithstanding the fact that Mrs. Herbert, according to her testimony, usually carried it in her passport book or purse on her person, and at no time was it out of her immediate control prior to the colonel's death.

The witness testified that it was an unusual instrument in form, such as she had never seen before in her experience as a bank employee, and she was unable to classify it. She testified that the colonel requested of her and Mrs. Herbert that they should not mention the transaction to anyone. This commitment of secrecy was not observed by the colonel himself, if the testimony of Miss Ruth Belle Allen, daughter of Mrs. Isabel Clark and an intimate friend of Mrs. Herbert, is to be accepted, as she testified that she met the colonel in Mrs. Herbert's apartment on the afternoon of October 10, 1927, and he was smiling and said to the witness, Mrs. or Miss Ruth Belle Allen, ''I told you I was going to pay Mrs. Herbert. I have given her a note for half a million dollars, payable a month after my death.'' She had known the colonel not longer than seven weeks. He further cautioned: ''I don't want you to mention this to anyone, Miss Allen.'' He called her Ruth. She said she would not mention the note. He said, ''I wouldn't tell you, but I can depend on you not to tell this where people will discuss it.'' He did not say why he did not want her to tell. Mrs. Herbert did not say anything, but ''just smiled''. The witness claimed that she did tell her mother and discussed the matter with Mrs. Herbert.

Returning to the story of the production of said instrument as related by Miss McKee, appellants seriously contend with good reasons that the reproduction, word perfect, of an instrument which is peculiar in its phraseology, and which the witness heard read but once and which she read herself but once, and which had not been seen or discussed by her or by anyone else in her hearing, after the lapse of a period of more than five years is such a wide departure from the usual and common experience as to the operations of the mental faculties as to partake of the miraculous in mnemonic feats and has a strong tendency to bring distrust upon the testimony of the person claiming the power to perform such a feat, tested by the rule of reasonable probabilities, taking due note of all the

other facts and circumstances which bear upon the testimony under scrutiny.

The witness, further describing the transaction, said that the colonel was lying on the bed while he was dictating, and respondent was sitting in a rocking chair, holding the paper on her lap as she wrote the dictation. The witness from her position said she could not see what Mrs. Herbert was writing. When the dictation was finished Mrs. Herbert read it over and said: "I forgot to put in the 'one month'." He said, "Insert it after the $500,000." She read it to him, and handed the note to him. He looked at it and got up out of bed and went over to the dresser and signed the note. He was in bed when she handed it to him after she had written it. The witness said he appeared to have read it. When he reached the dresser he pushed the cover back and began to use his arm as if writing. He had a pen in his hand which he got from Irene Herbert. The witness said she could not say it was a different pen or the same one used by Mrs. Herbert. She did not notice what was done with the pen. He handed the note to Irene. She took it, looked at it and said: "Colonel Lankershim, I thank you." The colonel went back to bed. Mrs. Herbert passed the note to her, she took it in her hand, read it, and returned it to Mrs. Herbert. She said she recognized the instrument dated October 10, 1927, as the same paper handed to her by Mrs. Herbert five years previously.

She further testified that the colonel told Mrs. Herbert "to take it [the paper] to the bank and keep it there until after his death, and then to take it up to his attorney, Mr. Macdonald, and he would see that she received the money." The witness did not know what Mrs. Herbert did with the note after the colonel gave the above instructions. It is certain that she did not follow his instructions in a very important particular. After Mrs. Herbert handed the note to the witness she left the apartment alone.

She first met the colonel in 1924, when she visited his apartment at the Biltmore Hotel upon the invitation of Mrs. Herbert. The witness recited the months from memory on which she had met the colonel since 1924. Most all of the five or six meetings were had upon invitation of Mrs. Herbert at the Biltmore Hotel. She took meals with Mrs. Herbert in the colonel's apartments and attended places of amusement as his guest. Upon the occasions when she was at his rooms Mrs. Herbert took to his rooms custard, vegetable soup or lamb

stew. On one occasion she prepared his bed for him; once she mended his hose and sewed buttons on his clothing and rubbed spots off his clothes after eating dinner; once she heard her call a valet and instruct him to take his clothes to the cleaner. She had also seen her rub his hands, the back of his neck and head, and heard him say, "she had a very soothing touch to her fingers". The witness stated in her deposition that the colonel said he was going to pay respondent well for her services. She quoted the colonel as saying, "I am going to fulfill my promise and pay you for services rendered." Nothing was said by either as to what would constitute a reasonable charge.

During the early stages of Miss McKee's testimony she described with meticulous detail the dictation as given by the colonel. She made conflicting statements both as to the year and month that the services were to be reckoned from, but finally said she remembered that the true date named as the commencement of service was January, 1924. The body of the instrument as written was reproduced word perfect, even to the order of its language. She said that in writing the instrument Mrs. Herbert omitted from the dictation the words "one month" next after $500,000, and her memory was that she discovered the omission while in the midst of writing the instrument. At other times she stated that Mrs. Herbert discovered the omission after she had finished writing the instrument. The time of discovery was left by the witness in a state of confusion.

She gave conflicting testimony as to whether Mrs. Herbert selected the place where the omission should be inserted without instructions from the colonel, or whether the place of insertion was made as dictated by him. In a part of her testimony she said that the colonel with much exactness instructed Mrs. Herbert to insert the omitted words immediately after "$500,000" as expressed in figures, and in other parts she said that he gave her no instructions as to the place where the insertion should be made, and that Mrs. Herbert inserted the omitted words without any instructions from anyone, as "she knew where to put it".

Miss McKee also testified as to paper, pen and ink being in the room, but did not see a blotter in the hands of Mrs. Herbert, on the table or elsewhere in the room. A caret indicates the place where the omitted words were inserted, which clearly

shows that they were supplied after the instrument had been written, or at least after the line in which they were inserted was completed. The witness also testified that Mrs. Herbert was seated in a rocking chair and wrote from her lap. A table and stationary chair were accessible and were used by the colonel when he is said to have written his name. In relating the circumstances in which the said instrument was written, she testified that the colonel arose from his bed, went to the dresser, took out a piece of paper and carried it, together with pen and ink, to a table and instructed Mrs. Herbert to write what he was about to dictate. Why Mrs. Herbert should have selected a rocking chair and written from her lap a document which she must have known was of tremendous importance to her, was not explained. It is not claimed the colonel sat in a rocking chair when he signed his name at the dresser. The note was read to the colonel as he was lying upon the bed, and handed to him. He took it in his hand and appeared to read it. He arose from the bed and took the paper and pen to the dresser and appeared to be writing. He returned, handed her the note, and went back to his bed. Mrs. Herbert said nothing to the witness that she could recall with respect to the instrument after it was signed and delivered to her. She left the apartment a few minutes later. During all of their close relations and friendship the matter was never again referred to until Miss McKee's deposition was taken almost six years later.

Whether or not the instrument had been folded before Mrs. Herbert had written the alleged dictation became a matter of inquiry. The witness testified that she held the instrument in her hand and read it. She was then asked: ''Q. Had it been folded at that time? A. It had not. Q. Perfectly flat? A. It was.'' The witness then returned it to Mrs. Herbert and said she didn't know what respondent did with it. Under examination by appellants, she said that she saw ''some printed matter'' on it but she did not ''pay any *attention* to the printed matter''. The following question was then put to her: ''Q. You did not read the printed matter on it then, did you? A. 'For value received,' I remember seeing that. Q. The Colonel did not dictate 'for value received', did he? A. It was printed on it. The Colonel did not dictate 'for value received'. I don't recall that Mrs. Herbert read 'for value received' when she read the contents of the note.

Q. Don't you know that she did not? A. I don't recall her reading it.''

The instrument shows a crease through the center. The experts point out that the spreading of ink is discernible in the trough made by folding in several places. The writing in crossing the trough loosened the fibre or sizing of the paper and left it much in the condition of blotting paper. It is pointed out that the capital letter ''H'' near the top of the paper, being the first letter of respondent's surname, and the letter ''m'' in ''me'', appearing near the signature ''J. B. Lankershim'', prove that Mrs. Herbert's writing was done across a distinct crease made by folding the instrument. It is also claimed that the ink penetrated through the paper in places and is discernible in the photograph taken of the back of the instrument. Several printed words not mentioned by Miss McKee and which were not stricken out by Mrs. Herbert appear upon the face of the instrument. ''Los Angeles, Cal.,'' the first words of the instrument, and the word ''dollars'', well down in the instrument, and the last five words of the ''value received'' clause, to wit, ''and charge to account of'', are printed words not referred to by the witness. The words ''value received'', which she had a distinct recollection of observing, were of great importance to the respondent's case. . The witness testified that she had not been aided by anything she had heard or seen since October 10, 1927, and her testimony was based solely on her memory as of that date. The witness had no such accuracy of memory as to any other matter printed on said note. She was unable to recall anything that Mrs. Herbert wrote to her when she invited her to the birthday dinner, or anything she said in her reply or in explanation as to why she was three days delayed. The other unusual trait of memory exhibited was her ability to name the several months in which she had heard the colonel speak in complimentary terms of Mrs. Herbert. In a number of other matters her memory was faulty.

The witness next in importance to Miss McKee was Mrs. Adele Blood Hope, also known as Miss Blood, who identified herself as ''formerly known as Adele Blood, the actress'', and as having played many engagements in Los Angeles and particularly the character of ''Everywoman'' in the play known as ''Everywoman''. She was forty-seven years of age, a native and resident of California, but had been residing

in New York city for some three years past and came specially to Los Angeles to testify in the case. She was engaged in the advertising business in New York. She said that she first met Colonel Lankershim in 1908 at the Lankershim Hotel, in Los Angeles. She was intimately friendly with him and the acquaintanceship continued until 1928 or 1929, which was the last time she saw him. She had known Mrs. Herbert eighteen or nineteen years. She first met her at her home at Great Neck, Long Island. She introduced the colonel to Mrs. Herbert either before Christmas day in 1923 or soon after New Year's day, 1924, at the Biltmore Hotel, Los Angeles. She left soon afterwards but returned about Christmas time in 1924. During a time when Mrs. Herbert and the colonel were visiting at her home in Hollywood, Miss Blood said that the colonel asked her if she knew that he had made Mrs. Herbert his companion. She replied that she had not known this, and the colonel said the very fine cooking that she had done in her apartment had made him realize that he had been living in hotels and not getting the right kind of food. He had been interested in getting his health in better condition. The witness said she then asked Mrs. Herbert how it seemed to be drawing a salary. She said she was not drawing a salary. Miss Blood then said: ''Well, if I were a companion to anyone I would certainly want to draw a salary for my work.'' The colonel said ''likely that I would, meaning me, but that he would pay Mrs. Herbert in his own time and in his own way. I told him I thought it was rather an unbusinesslike procedure.'' There is no evidence that Mrs. Herbert was a cook or ever was so engaged or that she was ever engaged as a nurse. Miss Blood, her close intimate friend, never knew her to be so engaged. The evidence points in an opposite direction. The colonel at all times stayed at hotels well supplied with bellboys, housemaids, valets, chefs and such other attaches as first-class hotels afford, and with the best there was of culinary art for the comfort and convenience of their guests. The fact that the colonel preferred first-class hostelries to the private home cooking of which it is said he was so fond is proved by the fact that, except for the few weeks he was at the Engstrum, where all relations with Mrs. Herbert ended, he made his home at the Biltmore Hotel, where every modern convenience of living and service was at his beck and call. There is no evidence to justify an

assumption that Mrs. Herbert at any time rendered regularly continuous or necessary service in the capacity of a cook, nurse or attendant, with the understanding or in the sense that persons are employed to perform such services. It affirmatively appears by the testimony of plaintiff's chief witness, Miss McKee, that he stated that he had a regularly employed masseur at the time the instrument in question was executed, and from statements of other of her witnesses it is clear that said masseur or attendant had been in his continuous service for a number of years, and it was his duty and habit to visit him every morning and administer to his physical needs and personal welfare. There can be no doubt but that he was surrounded by a coterie of attendants employed by the leading hotel where he lived in comfort and luxury.

The witness stated that in 1924 she rented a flat for occupancy by her mother at West Eighth and Garland Streets. Mrs. Herbert stayed at the apartments much of the time when Miss Blood was away, and also when she was there. Mrs. Herbert and Miss Blood's mother lived in the same flat both at Eighth Street, Los Angeles, and at Long Beach. Mrs. Herbert occupied the witness' room many times when the witness was not in Los Angeles. The colonel was then living at the Biltmore Hotel. Miss Blood was at the Biltmore Hotel from October, 1925, to the spring of 1926. She testified that Mrs. Herbert was always at the Biltmore apartments when she called on the colonel during her stay from October, 1925, to the spring of 1926. She saw Mrs. Herbert brush his hair and bring him a wet towel so he could wash his face. She would order his breakfast, and nearly always supplement it with something she brought with her. She saw her bring him his glasses and wipe them, and give him medicine, massage his neck and head. She sometimes put a light on his face for a nervous trouble he had on the side of his face. She had seen her dry clean his ties, mend his underwear and socks; help him put on his slippers and dressing gown; clean spots from the front of his clothing; order his meals; arrange for theater tickets and accompany him to the theaters and see that he was comfortable; assist him in the taxi and see that the windows were closed, which often made it uncomfortably close in going to theaters; saw her manicure his nails.

She said she and the colonel often walked from the Biltmore to Mrs. Herbert's apartments at the Engstrum and had dinner at Mrs. Herbert's apartments. She met him in Paris in 1926 and had lunch with him several times, and he expressed a regret that he had not taken Mrs. Herbert to Paris with him. (This was while he was on one of the regular annual trips he made to Paris to visit his wife, who was in ill health, and his daughter. He annually spent from four to seven months in Paris with them.) She testified that he expressed regret that he had not taken Mrs. Herbert with him to Europe as he was extremely lonely and had no one to go with him to the different restaurants and theaters. She noticed an unclean condition of his vest and tie and called his attention to his untidiness and he said: "If Irene was here this would not have happened. I have been so dependent on her care. Sometimes I am careless." She took him to her sitting room and removed the spots. She met him in New York in 1927. Mrs. Herbert came with him and she met them upon their arrival. He was then on his way to Paris to visit his wife and daughter. Mrs. Herbert· stopped at New York, where Miss Blood was then living. Miss Blood next saw the colonel in August or the first of September at the Engstrum where Mrs. Herbert was living. The witness left shortly for New York and did not see him again until her return to Los Angeles in the latter part of February or first week in March, 1928. She met him in the galeria of the Biltmore and had luncheon with him. He told her that Mrs. Herbert was no longer with him. The witness expressed surprise and the colonel asked her if she had not known it and she replied in the negative and asked him why it was. He told her that his attorneys had felt that "it was best that he have a man companion or attendant". The witness said it was too bad, as she had been with him during all these years. "I asked him what he had done, how much he paid her, Mrs. Herbert, for all the years of service, whether he had paid her and he said he had. I asked him how much he had paid her, how much he had given her. He said he had not given her money. I said, 'Well, that is rather amazing. What did you do?' He said, 'I have given her a note for services rendered', when he could easily give her money. He said he liked to do things in his own way. He always was not in a position from the curiosity of people surrounding him to do things as he wanted

to do even though he was a man of wealth." The witness asked the amount of the note and he said it was enough to take care of her for the rest of her life and that she would have "plenty for some of her pet charities". In reply to a further question as to when the note was due, he answered that it was due "one month" after his death. The witness then said: "I told him I thought it was a very silly thing, it would be very much better if he gave her money while he was alive instead of giving a note payable after his death. He told me that one of the real regrets of his life would be that he would not be here to see Mr. Macdonald's face when he saw the note." This was rather a grim quip of humor for a man who, as the witness said, was not then well and who certainly was infirm with age. The above colloquy illustrates very forcibly that she appeared to be more concerned as to the amount of money that her friend, Mrs. Herbert, was to receive from the colonel than she was in his comfort or his personal welfare. It also gives weight to the claim that someone exerted influence over him which outweighed any counter advice that his attorney might give him on the subject, and that such assurance of providing for Mrs. Herbert would tend to quiet the fears of his interrogator. Mrs. Herbert's name was again interjected into the conversation by Miss Blood, who said the colonel spoke of missing her care and that he was lonely and the man caring for him was not very companionable and did not add to his comfort.

The colonel left the Engstrum Apartments some three weeks after the transaction of October 10th, not later than the first of the following month, as related by Miss McKee, leaving Mrs. Herbert occupying a room on another floor, and returned to the Biltmore Hotel.

On cross-examination the witness testified that her first meeting with Mrs. Herbert was at Great Neck, Long Island, but she did not give the year. She never knew that she had any occupation. She said on three or four occasions, or possibly a half dozen, she had prepared meals for the colonel at his Biltmore apartments in 1924. The evidence by all other witnesses was to the effect that meals were served at his rooms by the hotel at his expense for his visitors, and that Mrs. Herbert brought with her on occasions soups or mutton stew or some delicacy which he specially fancied as supplementary to the meals ordered sent to his rooms. In

addition to what has already been related, she said that in 1924 she had seen Mrs. Herbert help the colonel up the walk, in and out of taxis, and saw that he had selected food. Mrs. Herbert usually had him by the arm, as he seemed a little feeble. The witness said she had visited his apartment upon his invitation many times and had breakfast, and had been there occasionally until midnight. Mrs. Herbert was also there, and she said she never saw Dr. Fred Foster, his masseur, attending him. Sometimes Mrs. Herbert signed the charge checks for meals, and sometimes the colonel signed them. On a few occasions Mrs. Herbert stayed at the Biltmore as her guest and occupied a bed in her room.

Four members of the Clark family, mother, father, daughter and son were witnesses in the case. The mother and daughter and son were called by plaintiff, and the father was called by the defendants. All were personal friends of Mrs. Herbert. Mrs. Isabel H. Clark, mother of Miss Ruth Belle Allen and Frank D. Allen, and wife of Ivy C. Clark, was the first of the family called to the stand. She had known Mrs. Herbert seven years. She first met the colonel when he was on his bed, sick, at the Biltmore. She was with her husband. Mrs. Herbert met them in the hotel lobby and all went to his room and she introduced them to the colonel. They stayed only a few minutes. Mrs. Clark and her husband went back after a short time, perhaps a month thereafter. He was then up. He had told Mrs. Clark on her first visit to come back and take lunch with him. Mr. and Mrs. Clark on their second visit stayed about two hours. Mrs. Blood and Mrs. Herbert were there. They took lunch in the colonel's suite. The witness said that the colonel spoke to her about Mrs. Herbert's kindness and faithfulness to him. She helped him to put on his shoes or slippers. She poured his tea. He was a great lover of tea. Before they left, Mrs. Herbert had to take him to his bedroom. Three or four months after she first met him, Mrs. Sidney Chaplin invited her to lunch. Four sons and Mr. and Mrs. Clark were all guests. The witness said whenever she met him he always spoke of Mrs. Herbert's loyalty to him. She said they visited him on other occasions at the Biltmore, and took lunch in the dining room at the Engstrum. The colonel and Mrs. Herbert visited the Clark's home in 1926 or 1927 and had meals. Mrs. Herbert made the tea and cooked at their home the spinach and chicken. She prepared

his plate and carried it to him. She took him to the bath and helped him; saw her massage his neck, head, arms, hands, feet and knees. She saw Mrs. Herbert do cooking many times at the witness' home or at the Engstrum Apartments at times when they did not take their meals at hotels or restaurants. The colonel, so the witness testified, said Mrs. Herbert was a "wonderful little girl"; that he intended to see that she was well paid for she was wonderful to him; he said she did his buying, such as socks; she always fixed his eggs and spinach to suit him. She had seen him being undressed on three or four occasions. She had seen Mrs. Herbert assist him in putting on and removing his trousers and clothing, and taking him to the toilet. His breakfast was often served to him while he was in bed. Mrs. Clark said the colonel particularly liked the way she [Mrs. Clark] cooked corn and beans, southern style. She said she took him flowers when she visited him at the Biltmore, and on one or two occasions she took him some of her home cooking.

Miss Ruth Belle Allen, a married woman who retained her maiden name, is a daughter of Mrs. Isabel H. Clark. She met the colonel for the first time the latter part of August, 1927, less than two months before the instrument in question is alleged to have been executed. He came with Mrs. Herbert to the hospital two or three times where she was interned for a short time on account of illness. The colonel told her that he had recently returned from Paris. On September 8, Mrs. Herbert and the colonel came to tell her goodbye, as they were leaving for Vancouver on a trip. The colonel said, "When we get back, come and stay with Mrs. Herbert and we will go somewhere." When they came back Mrs. Herbert called her and she went to Mrs. Herbert's apartment opposite the colonel's at the Engstrum. On October 2d, the three went by train to Palm Springs. She said she remembered once or twice having heard him say he was going to his attorney's office. They went to shows every night. He suggested going and he bought the tickets. They never stayed through a single picture. He always got tired and wanted to go home. He didn't like the show and said he didn't want to stay any longer. Mrs. Herbert usually prepared his meals in her apartment. She would assist him in dressing and help put on his coat and hand him his hat and cane. After he got in bed she would go in and say good night to him. She prepared

his laundry and his linen. She massaged his neck and feet. He complained of cold feet. When he ate his breakfast in his room he would sit on the edge of the bed, dressed in his robe. He took a nap nearly every afternoon. Before they left for Palm Springs the witness was alone with him while Mrs. Herbert was shopping. They discussed Mrs. Herbert. Her testimony was that Mrs. Herbert was ''so considerate of him, that he never had to ask her to do anything, that she thought of it before he even asked her''. He did not know how he could do without her; that his recent trip to Europe was a failure, and that he did not enjoy it because he didn't have anyone to take care of him. He said he was not paying her but he was going to pay her for what she had done. The witness said that during the few days they were there—from the second to the sixth of October—Mrs. Herbert washed his linen and brushed his clothes and did the cooking and housework. They did not take many things. The colonel took a bag. She said ''he always wore two or three pairs of stockings; she used to put those on for him and his shoes; and every time he would get up she would run to help him for fear he might need something—which I don't think he did—but she was just considerate of him''. He complained of his legs hurting him when he walked, and he took baths at the Indian spring. Dr. Foster (who had been his masseur during many years) took him to the spring. Dr. Foster arrived at Palm Springs by automobile two days before the colonel and the witness left. Dr. Foster took Mrs. Herbert into town and he and Mrs. Herbert left the same night by automobile. The witness then described a walk which she took with the colonel, during which he unveiled his secret thoughts and purposes to her, an acquaintance of less than two months duration. While taking this walk, she said the colonel confided to her that he was lonesome without Mrs. Herbert. He told her that she had been so good to protect him from people who had designs on him. Her exact words were: ''He said 'so many girls and their mothers were trying to get money from him with different schemes for movies, and Mrs. Herbert would not let any of them talk to him.' He said 'she had been so thoughtful and considerate and had protected him from everything of that nature, you know, designing persons is what I mean.' He said 'she had given him more care than his own people and she was more considerate than his own

children were and he was going to pay her for it.' " The witness replied that "would be fine". He did not say how much she was to receive nor when he was going to pay her. The witness said she helped him with his shoes, fixed his tie, helped to put on his coat and brushed his clothing that evening, as she had seen Mrs. Herbert do; that she and the colonel took the train the next day and arrived at Los Angeles in the afternoon and went to the Engstrum in a taxi. The witness remained overnight, and the next day, October 8, 1927, she went to Compton, her home, and went back to Mrs. Herbert's apartment at the Engstrum in the afternoon of October 10th, the day the instrument is claimed to have been executed. She had a conversation with the colonel upon entering, in the presence of Mrs. Herbert. The colonel was smiling when she came in and he said: " 'I told you I was going to pay Mrs. Herbert,' and I said, 'You did, colonel.' He said, 'I have given her a note for a half-million dollars, payable a month after my death.' He said, 'I don't want you to mention this to anyone, Miss Allen'—he called me Ruth. I said, 'I won't.' He said, 'I wouldn't tell you, but I can depend on you not to tell this where people will discuss it.' " He did not say why he did not want it discussed. Mrs. Herbert did not say anything; just smiled. The witness said that she was at Mrs. Herbert's apartment on another occasion when the colonel came in for tea. He was a great tea drinker. Miss Allen stayed a number of nights with Mrs. Herbert. The colonel went back to the Biltmore in October after he returned from Palm Springs. She believed the colonel said that he moved back to the Biltmore because the doctor and his attorney wanted him to move. That once, after he moved away, she, Mrs. Herbert and the colonel went to the Orpheum. She could not fix the date but placed it subsequent to 1927. The colonel always used taxis when she rode with him. At meals he frequently dropped food on his clothing.

On cross-examination she stated that she was thirty years of age and that she had been married, but did not give her married name. She had known Mrs. Herbert intimately since 1925 and she was still very friendly with her. She was visiting Mrs. Herbert and had been for several days before she went with her and the colonel to Palm Springs. She saw Dr. Foster at the Engstrum. He usually came to the

colonel's room before the witness was up. She had heard the colonel speak of Dr. Foster coming to his room. The witness said she recollected the colonel said he was going to *pay* Mrs. Herbert for the things she had done. He also used the word *"repay"*. He never said he was going to *leave* her anything. The witness finally said that in addition to the services rendered he said he was going to pay her for her *loving kindness*, for her protection of him. She denied on cross-examination that she testified in her direct examination that Mrs. Herbert did any washing for him at Palm Springs during the three or four days that Mrs. Herbert was there. She remained with Mrs. Herbert three or four days after October 10th. Mrs. Herbert moved downstairs to the second floor four or five days after October 10th. The colonel was left on the fourth floor. The colonel moved to the Biltmore. Mrs. Herbert did not tell her why the colonel moved out. The witness said that once after 1927 she saw the colonel in Mrs. Herbert's room on the second floor. She never saw the colonel after 1927. He died October 16, 1931.

When the colonel requested the witness not to repeat to anyone that he had given Mrs. Herbert a note for a half-million dollars she promised him she would not. She did tell her mother, Mrs. Isabel H. Clark, and Mrs. Herbert three years later, to wit, 1930. Then for the first time she discussed the matter with Mrs. Herbert. The fact that she discussed it was brought out on cross-examination, and the result was that it seriously impaired her credibility as a witness. Her statement made in justification for disclosing the information which she accepted in confidence, as told by her from the witness chair in November, 1933, and was made a matter of record by her sworn statement dated August 7, 1930, which was prepared to meet a future contingency, cannot easily be harmonized with a disinterested state of mind prompted solely by a desire that impartial justice be done.

According to the witness, Mrs. Herbert was present on the afternoon of October 10, 1927, at the time the colonel told the witness that he had given her [Mrs. Herbert] "a note for a half-million dollars payable a month after death", a subject which had never been mentioned by either until August 7, 1930. Her testimony in explanation of her action was that she was going East and did not think she would ever come back to California to live again. She asked Mrs. Herbert

if she had heard from the colonel and she said, "No, not lately." She then asked Mrs. Herbert if she wanted her to leave a statement of any kind to the effect that she had heard the colonel say that "he had given her that note." Mrs. Herbert replied, "if you want to. I don't think it is necessary." The witness then said: "Maybe I had better because I don't think I will come back to California to live any more." Mrs. Herbert then said, "All right. You write whatever you think you want to." Then I wrote the statement. The witness said after she had signed it she told Mrs. Herbert that a paper like that should be witnessed. Mrs. Herbert said she didn't think it was necessary. The witness then said, "Let's go to a notary public." The two went to a notary and the instrument was put in the form of a verified statement as follows: "On October 10, 1927, while I was visiting Irene Herbert or Mrs. Edres Herbert at her apartment at the Engstrum Bldg. at 5th and Grand St., Los Angeles, Calif., Col. J. B. Lankershim, who was a daily visitor of Mrs. Herbert, signed a promissory note for Five Hundred Thousand dollars in Irene Herbert's favor, payable one month after his death. He, in my presence, many times said he would leave Irene well fixed for her loving kindness and protection to him. The Col. willingly, agreeably, signed the note at this time.

"8-7-30 RUTH B. ALLEN.

"Subscribed and sworn to before me, a Notary Public in and for Los Angeles County, California.

"J. W. RAY,
"Notary Public.

"My Commission Expires August 2nd, 1932."

The witness had never seen the disputed document, but on cross-examination she testified that the colonel said he was going to *pay* her [Mrs. Herbert] for her *loving kindness and protection*. She also remembered he told her that the note was *"payable one month after death."* This was after the lapse of three years. This *language* is embodied in the instrument. The inference to be drawn from the above sworn statement is that she, Miss Allen, *knew* that he signed a "promissory note", not that she was told so by him. Indeed, taken by itself, it is subject to the inference that she saw him sign it. She then avers that he "willingly, agreeably

*signed* the note'' at the time. As a witness three years later she admitted she was not present when the alleged transaction took place. Her averments of August, 1930, also flatly contradict the persistent denials which she made at the trial that the colonel ever said that he was going to *leave* Mrs. Herbert anything, but he always said he was going to *pay* her for her services and he did not once use the word *"leave"* with respect to such services. She said that Mrs. Herbert did not make any suggestion as to what she should incorporate in her statement. The witness changed her testimony to the effect that Mrs. Herbert washed the colonel's linen at Palm Springs to a negation of that statement. At the Engstrum she saw her wash his clothing, but she would not say more than once.

Louis A. Duni, a private investigator and a former deputy United States marshal, and afterward an investigator in the district attorney's office at Los Angeles, called by appellants, testified that he visited Miss Ruth B. Allen at her home in June, 1933, and she, in the presence of her stepfather, Ivy C. Clark, and W. W. Wallace, who accompanied him, admitted that she wrote said statement at the dictation of Mrs. Herbert. Mr. Wallace, an attorney at law and connected with the law offices of J. Wiseman Macdonald, corroborated this testimony.

Frank D. Allen, a son of Mrs. Isabel H. Clark and brother of Ruth Belle Allen, testified that he had known Mrs. Herbert about nine years, and Colonel Lankershim since 1925. He first met him at Mrs. Frances Blood's house, corner of Garland and Eighth Streets. The colonel went to Europe every year in the late spring. He called on him at the Engstrum and at the Biltmore. On his first visit to the colonel's rooms, Mrs. Chaplin was with him. Sally Pepper and Mrs. Herbert were there. The next visit was made two weeks later. Mrs. Chaplin was with him again on this visit. Mrs. Herbert and three or four other women were in his apartment. He would, when downtown, often run in to see the colonel and say "hello". He visited him ten or twelve times when he was at the Biltmore. In August, 1927, he was in his room about two hours, trying to sell him a piece of property. He was not successful. No one else was present. Mrs. Herbert had gone to the Engstrum to make a little soup. The colonel said he did not know what he would do without her; that

she had been a lot of help to him; that she was always very kind about fixing the kind of food he liked and he said she would be well paid for her services; he didn't know what he would do if he didn't have somebody like her to fix food for him; that she suited him right; he said he liked very weak tea and a lot of it, that it made his kidneys function. He spoke quite often of what Mrs. Herbert had done for him. The witness said he saw the colonel at Mrs. Chaplin's and at Sally's. Mrs. Herbert was usually with him. She would always help him to the toilet. He wore some kind of a belt or supporter around his abdomen. He wore wool socks. He saw Mrs. Herbert give him medicine three or four times; saw her help him put on his trousers. ''He was kind of feeble''. Very heavy. Mrs. Herbert generally massaged the back of his head. He saw him in 1929 every two or three days at the Athletic Club, when he came to lunch with his son and daughter or Dr. Foster. He would generally ask ''how Mrs. Herbert was or if I had seen her''. He said Dr. Foster was taking care of him. In his visits to the Biltmore the witness saw Dr. Foster not more than once. He knew Dr. Foster was his attendant and had probably been his attendant for six years prior to 1929. When the witness saw the colonel at the Athletic Club where he was stopping it was only for a few minutes in passing. He had no extended conversation with him after October, 1927.

Mrs. Sarah L. Barrett, a witness for plaintiff, had known Mrs. Herbert since 1924, at which time she came to her flat on Garland and Eighth Streets and lived with Adele Blood and her mother. They occupied the flat three or four years, dating from the fall of 1924. She saw Mrs. Herbert at Mrs. Blood's flat every day in 1924, 1925 and 1926, except when she went to the beach; saw Colonel Lankershim at Mrs. Blood's flat at least three times a week. Sometimes a chauffeur brought him, and sometimes Mrs. Herbert brought him. Visited him three or four times at the Biltmore during 1924–1927. Went with Mrs. Herbert to the Biltmore in 1925 to help Mrs. Herbert carry some soup and vegetables and prunes. The witness saw Mrs. Hope prepare the articles in her kitchen. After arriving at the Biltmore Mrs. Herbert gave the colonel some sort of medicine. He was sitting in a chair with a blanket wrapped around him. At Mrs. Blood's flat on one occasion, before departing for the beach, she heard

the colonel say Mrs. Herbert had taken wonderful care of him and he was contented and happy since she had been taking care of him and he was going to see that she was well repaid for all she had done for him. At one time she saw Mrs. Herbert mending stockings which she understood were the colonel's silk stockings. Never saw her do anything else in that respect. The colonel once took Mrs. Herbert and the witness and a group of her friends in his limousine to Beverly Hills and to the beach for dinner. The colonel spoke of Mrs. Herbert's kindness and care. The witness instanced another day when she went to the hotel with Mrs. Herbert, who had bought some chicken and soup and took it to the colonel. She related a third and fourth occasion when soup and chicken were cooked by one or the other and taken to the colonel's rooms. Mrs. Herbert stayed at the Garland Street flat in Mrs. Blood's apartment until the spring of 1927. Adele Blood was there part of the time. Mrs. Herbert always went to the beach in the summertime. The colonel went to Paris every year and stayed several months. Mrs. Blood and the colonel were great friends and it was not easy for the witness to say whether he came to see Mrs. Herbert or Mrs. Blood. She finally said he came to see Mrs. Herbert as she was caring for him. She said that the colonel seemed to have perfect confidence in Mrs. Herbert. When the colonel returned from Europe Mrs. Herbert would return from the beach to the Blood flat. Except during the summer months, Mrs. Herbert was at the Garland Street flats all day, except when she went to the Biltmore. The colonel said he was going to leave her something but he did not state the amount. Her testimony as to her kindness and care of him and that he would see that she was repaid for the same was along the same tenor as the testimony given by Adele Blood Hope, Mrs. Isabel H. Clark, and others who testified in plaintiff's case.

The plaintiff called as a witness H. Gordon Bayliss, a Los Angeles physician. He had previously known Colonel Lankershim, but met Mrs. Herbert for the first time in 1927 on a steamer with Colonel Lankershim going from Seattle to Vancouver. The doctor was taking Senator Clark's sister to Victoria. Her nurse was accompanying her. The colonel and the doctor were thrown in conversation and Mrs. Herbert came up and had in her hand a pocketbook or purse contain-

ing money, and she said to the colonel that he had left his purse in the washroom and she brought it to him. When she stepped away the doctor said he was very fortunate to have a woman like that to take care of him, look after him. The colonel said yes, he didn't know what he would do without her. Mrs. Clark had also stepped away and the colonel said, " 'You seem to have a very wealthy woman in your charge. Is it very expensive, is she paying you well?' And I said, 'No, I am only charging my regular price.' Then I said, 'Is your nurse very expensive, cost you much?' And he remarked, 'No, I am not paying her scarcely anything now, but I expect to make it up to her all right later on.' " The colonel told the doctor that Mrs. Herbert looked after him in every way and had been with him three or four years. At dinner Mrs. Herbert had hold of his arm; he seemed a little uncertain on his feet. She got him his overcoat and readjusted a steamer robe which covered his feet. From the above, it would seem that the colonel had a keen interest as to the value of services.

Dr. George L. Cole was called by someone to visit the colonel at his apartments at the Biltmore on February 23, 1927. Mrs. Herbert was in the apartment when he called. The doctor prescribed some kind of a tablet for the colonel to take and suggested that he have a nurse. The colonel replied that Mrs. Herbert would take care of him.

Ethel Anspaker, a resident of Long Beach, had known Mrs. Herbert some eighteen years. The colonel and Mrs. Herbert came to her home in an automobile several times in 1926. She had a family of six children living with her. At one time he bought a set of dishes and Hallowe'en candy for the children. Mrs. Herbert helped him up to the doorsteps. He had tea. The witness made it and Mrs. Herbert served it. The latter saw that he was made comfortable. The colonel said the witness was very fortunate to have the children, as when she reached old age and needed help and assistance it would be given through love; that he was "old and ill and had to employttle people to take care of him, but I would be compensated through raising a family".

█ Mrs. Irene Herbert, being a party to an action upon a claim against an estate, was barred by virtue of the provisions of section 1880, subdivision 3 of the Code of Civil

Procedure, from testifying to any fact occurring before the death of decedent Lankershim.

She was sworn, however, as a witness in her own behalf and testified that she was then forty-three years of age and knew Colonel Lankershim in his lifetime. At this point an objection to her testifying on statutory grounds was made and overruled. She was shown the disputed document and identified it as the one set forth in the pleadings. She also testified that she presented a claim on the instrument for the sum of $500,000 and that it had not been paid. The witness said she read the prepared claim before she presented it but she did not know whether she verified the complaint or not. Her counsel offered to stipulate that she did, but opposing counsel refused to accept the stipulation, stating that he preferred to have the witness testify on the subject. The above was the extent of her testimony in chief. She was recalled at the close of defendants' case on rebuttal. The experts had testified that the paper upon which the note was written had been folded before Mrs. Herbert wrote any part of the body of the instrument. This, it was contended, was made physically manifest by ink penetrations and spreading of ink as the pen crossed the crease made by the fold. No expert who testified on the subject had any doubt as to the physical fact. Miss McKee had early testified that the note was perfectly flat and had not been folded when she handled it. Clark Sellers testified that shortly before the trial day and at a time when the experts were making scientific tests of the genuineness of the document in the offices of plaintiff's counsel, Lieutenant of Police H. C. Nutt, Mrs. Herbert and Miss McKee being present, plaintiff was asked by Clark Sellers if the fold which extended from the top to the bottom of the document was on the document when she wrote it and she said the document was flat, unfolded, and she folded it and put the crease in it after she had written the body of the document. Lieutenant H. C. Nutt, supervisor of the crime investigation laboratory and a specialist in the investigation of questioned documents, who was at the time examining the document, corroborated Clark Sellers. He further added that Mrs. Herbert, after stating that the note was flat and smooth when the colonel. handed it to her, declared that he admonished her to ''take good care of this note because it was valuable''. She further said: ''I placed

this note in a passport folder and carried it in this folder flat for some five or six months. At that time I noticed the end had become torn somewhat, and that the ends were becoming frayed, and at that time I folded the note in the center or middle and carried it that way in the passport folder until such time as I delivered it, or showed it, rather, to Mr. Macdonald.''

On rebuttal Mrs. Herbert was asked if she ever carried the note in her purse and she answered that she had for several days at a time and that it was not in any kind of a covering folder or envelope at any time. She was then asked if Mr. Sellers asked her if it had been folded before she wrote on it and she answered ''No.'' She said the subject of folding the note was not discussed. Miss McKee, also a rebuttal witness, testified that the fold in the center of the paper was not mentioned by anyone during the two periods at which she was present during the investigation made testing the genuineness of the document. Mrs. Herbert did not deny or affirm the controverted question as to whether the paper had been folded before she wrote the alleged dictation. She explained other matters in connection with the physical appearance of the note, but she did not deny the claim that the paper had been folded before it was written upon by her. If carried in a purse without covering or protection of any kind through a period of four years it must have become at least badly crumpled and wrinkled at the end of that period.

The foregoing summary of the testimony states the full strength of plaintiff's case as made out by the parol evidence of the witnesses offered by her. The documentary evidence, particularly photographic copies of the questioned document, is now before the court for inspection in form and size of the original and also in enlarged sizes, together with exemplars of decedent's handwriting for purposes of illustration in other matters pertinent to the *bona fides* of said instrument. The witnesses used as handwriting experts and also to make chemical analyses of the ink used in producing the instrument (two of whom were called by the defense and two others were named by the court) gave adverse testimony as to the integrity of the instrument.

Appellants contend that a conspiracy was conceived by Adele Blood Hope and Mrs. Herbert, actively aided and abetted by Stella McKee, Mrs. Isabel H. Clark, Miss Ruth

Belle Allen and Frank Allen, all but one being companions of Mrs. Herbert, to establish as genuine a spurious claim against said J. B. Lankershim's estate and set about to devise a plan of sharing in his estate; that in consummating said plan it was necessary that it be done secretly and in such fashion that the evidentiary facts upon which said parties were to rely should be confined to the knowledge only of the parties themselves, thereby rendering it impossible to impeach the testimony of any one of them by direct evidence, Colonel Lankershim being dead. It is argued that the only way by which plaintiff and those who acted in concert with her could succeed in their design was to adopt a plan whereby payment of the claim would be deferred until after death. It is further argued with great force that the normal, usual and businesslike way in which men dispose of large fortunes is by will, by trust arrangement, or at least by adopting some method which would place the stamp of verity upon their acts, and if not so conforming to testamentary rules and prescribed forms of law, they at least would safeguard their ante-mortem wishes with suitable barriers to withstand anticipated attack. Colonel Lankershim took the precaution to make a will in which he made no provision that plaintiff should share in his estate. Neither did he establish a trust fund or make any provision for the immediate payment of any sum by check or order. Any of said methods would have furnished some substantial evidence in support of the authenticity of his act. Neither Colonel Lankershim's legal and business adviser and business associate, who was one of the executors of his estate, nor his daughter, son or confidential secretaries have any knowledge of the note transaction. Miss McKee testified that the colonel told Mrs. Herbert to deposit the note in a bank; that it was very valuable. Instead, she testified she carried it loosely placed in her purse and passport folder for more than four years. Miss McKee said that the colonel instructed Mrs. Herbert to take the note to J. Wiseman Macdonald after his death and he would see that it was paid. Miss Blood also testified that the colonel, in recounting to her what he had done for Mrs. Herbert, said it would be ''one of the real regrets of his life that he would not be here to see Mr. Macdonald's face when he saw the note''. This occurred in February, 1928, at the time the colonel had been sharply taken to task by Miss Blood for not

having provided for Mrs. Herbert in accordance with her desires. Miss Blood testified that when the colonel told her he had not given her money but a note ''payable one month after death'', she said to him that she was ''amazed'', and she further said to him that she thought ''it was a very silly thing, it would be very much better if he had given her money while he was alive instead of giving a note payable after his death''. This was a very natural and pertinent observation.

Mr. Macdonald, his attorney, adviser, and the manager of the Lankershim Estate Corporation, when called upon to prepare decedent's last will and testament, had not the faintest hint that an outstanding claim in the sum of $500,000 evidenced in the manner shown by the evidence was to be uncovered for the first time in the settlement of the estate. It is scarcely conceivable that a successful business man of wide and varied experience, in the circumstances of the case presented, would leave his executor and business manager in total ignorance as to the *bona fides* of a claim of such proportions without realizing that it would beyond doubt, from the nature of the transaction, meet with rejection by the person whom he had appointed by his testamentary act to pass upon it. It certainly would seem that the decedent would have adopted similar safeguards against the miscarriage of his desires with respect to Mrs. Herbert which he adopted with respect to his own children if he intended she should participate in his estate, particularly if the imputation of Stella McKee, Miss Blood, Mrs. Clark and Miss Allen to the effect that he placed Mrs. Herbert as having gained favor over his wife, son and daughter, is to be credited.

By the words of the colonel himself as related by the witness called to establish the execution of the questioned document—Miss McKee—corroborated by witness Frank D. Allen, the colonel had in his employ at the very time of the execution of said instrument and had had for several years prior thereto, Dr. Foster, a trained masseur and attendant, who personally served him to the end of his days. Miss McKee said that on the morning that she and Mrs. Herbert entered the colonel's room he appeared disappointed that Dr. Foster was tardy and he was highly displeased that the person whom he *paid* to give him treatments had not yet made his appearance. Frank D. Allen, another of plaintiff's witnesses, gave

testimony that he had information to the effect that Dr. Foster had been rendering personal services for the colonel for several years.

It cannot be successfully contended that Mrs. Herbert rendered requested services under any express agreement of employment. She had no fixed hours of employment or definite duties, and the evidence does not satisfactorily support a finding or an inference that she conducted herself or regarded herself as a hired employee or acted in the capacity of a nurse, masseur, or paid companion. During the period for which compensation is claimed, 1924-1927, both inclusive, Colonel Lankershim spent practically one-half the time in company with his wife and daughter in Europe, and Mrs. Herbert's witnesses do not claim that she was in his company except upon the occasions stated by the witnesses testifying in her behalf while he was living at the Biltmore Hotel. Bills for theater tickets, dinners, taxi charges and for other amusements and entertainment during a period of some three months prior to October 10, 1927, show beyond question that the colonel was the host for the pleasure of his guests, who were friends and companions of the plaintiff, on numerous occasions. Besides, he paid all of Mrs. Herbert's expenses while she was living at the Engstrum, and also her expenses for a trip to New York where she visited with her friend, Miss Blood, and to Vancouver, B. C., which latter trip was completed but a few days before October 10, 1927. Colonel Lankershim was a generous host, and no doubt paid many hundreds of dollars, which do not appear in evidence, for the pleasure and amusement of his women guests during the period embraced within the inquiry. According to the uncontradicted testimony of H. O. Moulton, bookkeeper for the Lankershim Estate, he carried to him during his short stay at the Engstrum, occupying apartments opposite Mrs. Herbert's room, pocket money, the occasions and amounts he did not recall, but his usual amount for such purposes was from $200 to $500. The foregoing is a full *résumé* of all the oral evidence presented by plaintiff and states the full strength of her case.

It is the contention of appellants that the evidence offered to prove respondent's case is patently insubstantial and is too inherently improbable to entitle it to be used as the basis of a judgment in an important cause. It is further urged that

respondent relies upon the weakest kind of evidence known in the law, to wit, alleged declarations of Colonel Lankershim, since deceased, to support her judgment. Appellants also contend that the declarations testified to by Mrs. Adele Blood Hope and Miss Ruth Belle Allen are entirely nullified by the recorded words of decedent which appear in his correspondence with his wife and daughter and which will later be set forth at considerable length. In addition to the specifications as to the insufficiency of the evidence, questions of law will be given consideration; but before doing so we will complete the review of the evidence with a summarization of that adduced on behalf of the appellants.

There can be no doubt that Colonel Lankershim was afflicted during the closing years of his life with atrophy or degeneration of the optic nerve, a progressive disease which often comes with old age. Dr. George H. Kress, an eye specialist, began treating him November 1, 1927. His testimony was that when he examined his right eye on that day he was not able to distinguish a raised finger removed more than one foot from his face. The visual capacity of his left eye was reduced from one hundred per cent, the standard, to between thirty-five and forty per cent. That was the extent to which he could see into distance. With his right eye he could see nothing in distance. The specialist said he always came with an attendant, and his gait was that of a man who did not see well, and he was guided by an assistant. He told the doctor that when he was in Paris in 1927, a few months prior to October 10, 1927, he was informed that he had cataracts and his vision was poor. He said he could not see. Examinations of his eyes showed a disintegrating condition that foretold approaching blindness. In the opinion of the specialist, Colonel Lankershim was not able to read the disputed document on October 10, 1927, with the naked eye. With fitted glasses he would not have been able to read the entire document at one reading operation. Notwithstanding the opinion of Miss McKee, Miss Blood, and one or two others who testified that his eyesight was good, the fact is that practically every witness for the plaintiff, including Mrs. Herbert herself, in enumerating the compensatory services which she performed, included as an item of service "reading" to the colonel. His bookkeeper, Mr. Moulton, testified that the colonel's eyesight began to signally fail in the latter part of 1926. He used a

large magnifying glass about six inches in diameter to assist him in reading. His business and his private letters from his wife and daughter were read to him by his confidential secretaries. He signed some checks, but Mr. Moulton usually signed them. It was necessary in signing his name for someone to guide or direct his hand to the proper place for his signature. Often he would run off the line. After 1926 he did not attempt to write letters. Miss Alice E. Tufts, secretary of the Lankershim Estate Company for thirty-five years, saw the colonel practically every working day when he was in the city. He went to Europe every year in the spring and returned in the fall. In 1926 his eyesight failed him greatly. She purchased the magnifying glass mentioned by Mr. Moulton. Prior to 1925 he wrote weekly to his wife and daughter personally, after that period the witness took dictation and transcribed his letters. She identified approximately 100 carbon copies of letters dictated by the colonel to his wife and daughter during the years 1926 and 1927, one of which was dated the day after October 10, 1927. Others were written several days apart, both before and after October 10, 1927. The letters written to them by him express affection and concern for the members of his family. A few of these letters will be noted later.

Miss Tuft's office adjoined the private office occupied by the colonel, with a connecting door. She had observed the condition of the colonel's eyesight since 1920. In 1926 it failed very much. He had difficulty in reading and had the witness purchase the magnifying glass above mentioned. The witness frequently mailed letters written by him to his wife and daughter. Beginning with 1925, all of the colonel's letters from his wife and daughter were read to him by his secretaries. The witness was shown an unsigned letter written from Vichy and addressed to Mrs. Herbert, in care of Mrs. Adele Blood, the greater portion of which was typed but to which a few lines were added in longhand which she said may have been written by the colonel, but if it was written by him he probably had some kind of assistance such as a high-power glass. The letter briefly referred to his return trip and to other matters which sufficiently identify it as being a communication from the colonel to Mrs. Herbert. The written portion of the letter makes inquiry of the address of a lady living on Riverside Drive, and also the address of a lady

who had downtown flats. The letters forming his words are frequently unconnected and stand alone. The alignment is fairly good. The other two letters, one mailed at Vichy July 19, 1927, and the other mailed from Paris July 28, 1927, are in typewriting and bear the colonel's signature, the surname being divided into three sections. Said letters have to do principally with his return to Los Angeles, and make references to the weather, his health, with directions as to his address, and greetings to friends generally, with special mention of Miss Blood. A number of checks collected by plaintiff were introduced bearing the colonel's signature before and after October 10, 1927. Some of the signatures are on the ruled lines and are well written, while others indicate a hand not sufficiently guided by good eyesight. One instance of poor vision is evidenced by a check dated October 20, 1927, ten days after the transaction in question. The only letters at all legible in his signature are "J. B." The upper part of the loop in the letter "L" is discernible, but one not familiar with the circumstances would be wholly unable to reconstruct his or any signature. Evidently the ink had ceased to flow from his pen and his eyes were unable to tell him that his pen was not registering. A few broken and incomplete ink lines which follow immediately indicate that the eyesight had failed and by force of habit of many years he had gone through the arm motion of writing his name. Three checks bearing his name and dated October 10, 1927, are in evidence. One for $33.50 payable to American Radium Products Co. is so greatly superior in execution as to distinguish it from his other signatures. The second shows a failure of the ink to register in places and the third which is made payable to the Engstrum Apartments in the sum of $214.88 is typical of other signatures already discussed. His secretaries say that wherever his name appears signed in the proper place on any note, check, bill or instrument subsequent to 1925, either his hand was directed by another or it so happened by accident. The testimony of his theater and moving picture guests to the effect that he said he "had to be seated" in the second or third row leaves no doubt as to seriously impaired vision. The testimony of Miss McKee, Dr. Foster and others is that Mrs. Herbert or whoever was with him, took his arm to guide his steps when he was on the street.

Ivy C. Clark, husband of Mrs. Isabel H. Clark and step-father of Ruth Belle Allen and Frank D. Allen, first met Mrs. Herbert at the Biltmore in 1926. He testified that he first met Colonel Lankershim in 1926, also at the Biltmore, when he was ill. His stepson, Frank Allen, was insistent that he and his mother go up and meet the colonel, so they decided to go up, and took some flowers. He met Mrs. Herbert at that time, and on a number of occasions thereafter. During the latter part of August or the first part of September he received a telephone call from Mrs. Herbert and in response to it he and Mrs. Clark called at the Biltmore. Mrs. Blood was there but the colonel was not present. When the colonel came in he ordered lunch brought to the room. After lunch another lady came in who said she was an old friend of the colonel and she was interested in something the colonel had brought from Europe. This lady and the colonel went into another room to view some exhibits, and while they were out something was said about the colonel making a nuncupative will. He (Clark) stated that Mrs. Herbert said she and Mrs. Blood had been to New York and made a contact with an attorney who said that if three persons would testify to the fact that the colonel said he was going to leave Mrs. Herbert a certain amount, it would be legal. The witness said he questioned the proposition but Mrs. Herbert said it was so. The witness then said to her if he was going to make her the recipient of this estate, why not have him go down to his attorney and have him make a will and sign it, properly drawn up. She said, ''That is the idea, but I cannot get the old devil to do it.'' Then the witness said, ''That is all right. If that is the will of the colonel there is no reason why he (Clark) should not say it.'' The colonel then came in and Mrs. Blood said, ''Colonel, it looks as if it were getting about time you were going to fix up what you were going to leave Irene.'' He said, ''There is plenty of time. I will take it up with my attorney.'' Prior to this time Mrs. Herbert had often said when visiting the witness's home that the colonel had promised to leave her something; there was no stipulated amount. When she went to the Biltmore he (Clark) was invited to lunch. The colonel had returned from Europe and Mrs. Herbert said he wanted to see him and his wife. Someone had said they talked to a lawyer about the colonel making a will. The witness said he had been a preacher in his

younger days and he and Mrs. Clark had spent a good many years among the American Indians. He did the harvesting of crops and his wife did the preaching. He liked the colonel and he thought he was a very intelligent man to talk with. They discussed the condition of Europe, the international bankers and the war debt all afternoon. He thought the colonel had a positive mind and was not easily talked out of his position. The witness tried to sell him some property once, as did others; but he said he would have to consult his attorney first. He reported that he consulted him and after talking it over they decided not to purchase. When he left Mr. Macdonald's law office Mr. Macdonald shook hands with him and said: "We won't question but what Mrs. Herbert was very good to the old gentleman and is due some consideration." The witness said Mrs. Herbert had told him that the colonel was going to take care of her. The colonel did not say "anything about doing anything for Mrs. Herbert. He just answered that when Mrs. Blood asked him." The question of a holographic or nuncupative will was discussed in the colonel's absence by Mrs. Herbert, Mrs. Blood and the witness, but he was of the view that Mrs. Herbert did not state that he was to make such a will.

Fred M. Foster, the masseur and attendant, often referred to in the case as Dr. Foster, testified that he had been in the colonel's employ since 1920 to the time of his last illness; he gave him a treatment every morning between 6 and 7 o'clock, which consisted of massage and bath; gave him bodily treatments for the bowels and bladder not necessary to relate, and he applied treatment to his eyes and otherwise administered to his needs. He often took breakfast and stayed until noon or later; looked after his clothes, sent his suits to the cleaners and his linen to the laundry, and kept his wardrobe in order; ran errands, made purchases of wearing apparel, read the newspapers to him and drove his automobile quite frequently for him; in 1927 read to him practically every morning and evening and often accompanied him to his office; from 1924 to 1927 the colonel was quite often ill and sometimes remained in bed for a few days. His eyes went bad in the fall of 1927. The witness moved the colonel from the Biltmore to the Engstrum in September, 1927, and moved him out in November, 1927. He did not remember ever seeing Mrs. Herbert in the colonel's apartment at the Biltmore. He saw

her on the mezzanine floor and galeria. He saw her frequently in the colonel's room at the Engstrum. He was familiar with the dresser and all the furniture in the colonel's room. He had reason to open the drawers where he kept his personal effects but he never saw checks, paper, pen, blotter or ink in his room. The witness said he performed the same personal services for the colonel that he always had performed during the time he was at the Engstrum. The witness was at Palm Springs while the colonel, Mrs. Herbert and Miss Allen were there, and accompanied Mrs. Herbert back to Los Angeles. The witness accompanied the colonel on his visits to Paris in 1928, 1929, 1930 and 1931.

The appellants offered to prove, after an adverse ruling by the court, that on the forenoon of November 4, 1927, at the time that Dr. Foster was moving the colonel's effects from the Engstrum back to the Biltmore Hotel, Mrs. Herbert said to Foster: "I have got free of the doddering old fool; I have kicked him out." An objection was sustained as to the offer on the ground that the evidence was immaterial.

The record is replete with declarations favorable to plaintiff, admitted over appellants' objections that said declarations were hearsay and self-serving. The excluded declaration was made three weeks after the date of the disputed document. According to her own claim, her services were to continue to January 1, 1928. It was a declaration which, if believed, was inconsistent with and contradictory of plaintiff's case, which was largely founded upon the "loving kindness and protection" clause of said document. It was also admissible as tending to impeach the testimony of certain witnesses as to the tender care and vigilant service Mrs. Herbert rendered in the colonel's behalf. It was also material matter for consideration in the determination of whether a person who had received a princely gift but a short time before would thus angrily turn against her benefactor. There is no doubt as to its materiality and its exclusion constituted prejudicial error.

There is no question but that a very wide latitude should be given as to the introduction of evidence in cases involving issues of the kind presented in this proceeding. Obviously, the nature of the transaction justifies the indulgence of considerable liberality in the admission of any evidence which would shed light on the relation existing between

the parties, especially where one of them has since become deceased.

■ Mrs. Mary C. Hawkins was the switch-board operator and clerk at the Engstrum Apartments in 1927. Her duties were bookkeeping, attending to the wants of the guests, seeing them as they came in and went out, and taking care of their business. Everyone who came in or went out passed by her. Mrs. Herbert came to the Engstrum Apartments in the middle of August, 1927. She occupied a room on the first floor. Colonel Lankershim came about September 1, 1927, and occupied a double apartment on the fourth floor. The day after he came, Mrs. Herbert moved to a room directly opposite the colonel's. She stayed there until the middle of October and said she wanted to be moved away from that apartment. She was changed to the second floor and stayed there until the colonel moved out, which was about the first of November. All items of Mrs. Herbert's rent were charged to and paid by Colonel Lankershim. When she testified that Mrs. Herbert asked that she be transferred from her room opposite Colonel Lankershim's, she was asked by counsel for appellant this question: "Did she say why?" An objection was made to the question on the ground that it was irrelevant, incompetent, immaterial and hearsay. Counsel for appellants then made an offer of proof that, if the witness had been permitted to answer, her answer would have been as follows: "Mrs. Herbert, on October 15, 1927 came to me at the desk and said she would have to make a change, that the colonel was coming into her room in his bathrobe and embarrassing her before her guests and annoying her at all times and she could not stand it any longer and that she wanted to be removed away and wanted a room in another part of the building." The court sustained the objection, both as to the question and offer of proof. This ruling was prejudicial error. In the first place, it was a declaration against the whole theory of plaintiff's case and it was admissible as impeachment of the testimony as to the kind and sympathetic feelings which plaintiff had for the colonel. This was but five days after the tenth of October transaction is claimed to have taken place. It was entirely proper for the jury to take into consideration, if they believed the witness, whether it was at all probable that Mrs. Herbert would have made such a statement had she in fact been made the recent recipient of a $500,000

note; or, if she made said statement, was it because of resentment stirred by disappointment in not being able to accomplish her purpose? At that exact time, if the story told by plaintiff's witnesses is to be believed, she had in her possession an unpaid note, the payment of which depended largely on the favor of the colonel. This presents an issue of fact which was a question for the jury's consideration. A holding that the evidence was hearsay could, for like reason, exclude a large portion of plaintiff's case. In addition to its rebuttal nature, it was admissible as bearing on the question of a statement made against interest. The testimony of Louis A. Duni, offered in impeachment of Miss Allen, and H. C. Nutt, who testified that Mrs. Herbert told him in the presence of Clark Sellers that at the time the note was written the paper was flat and smooth, was considered earlier in our review of the evidence.

Appellants offered evidence which was sustained on the objection of plaintiff for the purpose of fixing the reasonable value of the alleged services performed by plaintiff, in the event the jury should find that she was entitled to compensation, but the court, after receiving some evidence on the question finally struck out all the evidence bearing on the subject, holding that it was not an issue in the case, and so instructed the jury. We are of the view that such testimony was properly received in the first instance and that it was error to strike it from the record. We are of the view, as between section 1605 and section 1606 of the Civil Code, that the latter section is more applicable to the facts of the case (eliminating, of course, the issues of fraud and confidential relations and undue influence) than is the former.

We now come to review the evidence of Miss Doria C. Lankershim, daughter of the decedent, Colonel Lankershim. From 1920 to 1931, she lived in Paris with her mother and Doria's adopted daughter. Her mother died in Paris in 1928. Her father visited her and her mother every year since 1924. He remained with them from three to four months. She was with him every day, making visits outside of Paris and especially at Vichy, which is a health resort where bathing in medicinal waters is the main treatment for the ailing. They often attended theaters and other places of entertainment and amusement in and near the city. The mother, who was practically an invalid, would go when she was able. They rode

a good deal in automobiles, as the colonel enjoyed riding through the streets of Paris and the public parks and to neighboring cities. She went with her father to the bank on many occasions in 1926–1927 and she had to direct his hand to the place where he was to sign his name. From 1920 until his death he wrote to her and her mother every week. She identified carbon copies of letters addressed either to her or to her mother bearing dates very near the day the disputed document bears date. One of said letters was written October 11, 1927, the next day after said document is claimed to have been signed by decedent. In this letter he makes mention of his recent visit to Palm Springs and states that he had moved to the Engstrum Apartments, which afforded him more room, and it was near the Biltmore, where he took his meals. He spoke of Jackie, the adopted daughter, and said he was glad she was well and that pa sent her regards. He described a grand opera performance which he had attended in Los Angeles and expressed the opinion that it surpassed the grand operas he had attended in Paris. We quote the paragraph which makes reference to his son ''Jack'' and the ranch in San Fernando Valley on which he resided:

''Jack comes in to lunch with me once every week at least and we talk over business matters in which he is very well posted. I wrote in one of my other letters about the dinner that he gave out at the Ranch House that was very nice; and some of our old friends were there that we used to know at The Lankershim.''

He mentioned the fact that when at Palm Springs he visited the town of Indio where he met an old friend and described the town and spoke of the orange and grapefruit industry, and its possibilities. On September 30, 1927, he referred to a birthday party given to Jack at the ranch and described the meal served and the decorations in flowers from the pergola on the ranch and said they were beautiful. He spoke of the ranch house having been remodeled and refurnished. He said Jack was looking well, was attending strictly to business and he found everything in very good business condition when he came back and he was well satisfied. He made mention that Jack was coming to have lunch with him at the Biltmore and he was looking forward to a very pleasant meeting with him. He said Jack had promised to write to her and her mother. He stated that he received a letter from

"mother" yesterday and she stated it was getting cooler in Paris, more like winter. He wished to be remembered to Jacqueline and to tell her that he thought of her as often as she thought of him. On November 10, 1927, he acknowledged the daughter's letter of October 27th, and was pleased to know that they were so well and happy; that their letters came very regularly and that he was always glad to see them. He said he went to the theaters to pass the time, as he could not see very well; his eyes were not very good and all the pain he formerly had in his face had gone to his eyes and he was not feeling so well at times. He wrote that Jack was in every week to take lunch with him and talk over business. The balance of the letter spoke optimistically of the present and prospective condition of the city and surrounding community, and he predicted that the San Fernando Valley where his son lived was to become a great picture center. On November 5, 1927, he wrote that he had just received a letter which had been delayed some days; he said that Jack took lunch with him the day before and was looking well and was taking an active part in all business with him and they were getting quite "chummy". He said it was certainly very pleasant to have one of his own family working in harmony with him, and he spoke of his interest in "Jackie" and her education. He also said that he received a letter from "mother", in which she stated that she did not receive a letter from him during the week prior, and he replied that it must have been delayed on the road.

In a letter dated September 7, 1927, he wrote of current matters generally and particularly of his affairs and contemplated realty improvements on a large scale. Recently he had visited the ranch with Mr. Macdonald, and Jack showed them everything about the large properties. In fact he said: "Jack takes a great deal of interest in everything and all the matters he undertakes are very well taken care of. It is certainly a great pleasure to me to see how well he attended to business when I was away. He wants to be remembered to you."

A letter dated March 12, 1927, evidently written in answer to one he had received from his daughter, mailed at Monte Carlo, acknowledged the receipt of photographs of the baby and spoke of her pleasing appearance and said he was glad they were so happy. He spoke of having mailed a postal at

Palm Springs and said their letters came every week and he was always glad to hear from them, especially from "your little one"; that he was having the baby's picture framed and that Jack had the one framed in which the baby was holding the dog in her arms. He informed his daughter that her mother had written to him that the daughter was going to Monte Carlo soon and he hoped she would have a very pleasant time there. He said Jack gave a New Year's Eve party at the Los Angeles Athletic Club for a few of his friends, and it certainly was very enjoyable; that Jack "always speaks of the Little One and seems to take as much interest in her as any of us". He closed with love to all.

Inasmuch as the evidence is vigorously attacked as being self-contradictory and too inherently weak and improbable to sustain the verdict and judgment, we will give first consideration to that issue. In doing so we will make such deductions from the evidence as are warranted by the facts of the case or which are in accord with the common experience and propensities of mankind, the course of business and the laws which ordinarily direct human action. It cannot be disputed that the attacks made upon the evidence are based on substantial grounds, and a very serious question is presented as to whether, upon analysis, the evidence may be said, as a matter of law, to be sufficient to support the judgment. The appellants are entitled to have their reasons supporting their objections stated. We will, therefore, refer to a few of the grounds set forth and also the reasoning of appellants from established premises which seriously challenge the correctness of the jury's implied findings as to the sufficiency of the evidence to support its verdict.

The letters above reviewed, some addressed to the daughter and others to his wife, indulge in comment as to current matters, but only such parts as bear upon his love and concern for the members of his family are set forth. His recorded words, as shown in letters written near October 10, 1927, compared with his brief notes to Mrs. Herbert, completely refute the insinuation thrown out by Mrs. Adele Blood Hope, Miss Ruth Allen, Mrs. Isabel Clark and Miss McKee that he was inconsolably "unhappy" when not in the company of Mrs. Herbert and that he "didn't know what he would do without her"; that he was "lonesome" when she was absent; and that his visit to Europe was a "failure"

because she was not with him; that she had done more for him during their four years of acquaintance than anybody in the world, including the members of his own family, thereby forcing the inference that Mrs. Herbert had risen to a higher place in his esteem through the kind of association and attention described by the evidence than any other person whom he had ever known, and that he had been influenced by some strange conceit to acknowledge her over wife, daughter and son. This is hardly the part that one would be expected to take who, by her own averments, had been employed to "console and sympathize" with her employer "in times of worry and anxiety", and "to protect from artful and designing persons" at all times. The written words which came directly from the decedent at the precise period when Miss Blood and others say he expressed to them a higher esteem for Mrs. Herbert than he did for his wife and children offer a protest to the unnatural imputations of said witnesses testifying on behalf of the employed sympathizer and protector, whose duty it was to promote contentment and happiness in the colonel's life and to permit nothing to disturb or mar the high regard and serene confidence that was essential for the peace of mind and happiness of the head of a family. Her office was, according to her averments, that of promoter of happiness and contentment, as well as a protector against intrigue and designing persons. The fact that he spent by choice practically one-half of each year on pilgrimages in visiting his wife and daughter and that the portions of the other half could have afforded but little opportunity for association with Mrs. Herbert, in accordance with much uncontradicted evidence, tends to refute the claim that the company of Mrs. Herbert was the first consideration of his life, or that she could have devoted as much time to his comfort and happiness as the testimony of said persons sought to establish. ▮▮▮ Testimony coming from one's own written declarations is entitled to more serious consideration than is evidence of a secondary or hearsay character as to what a person, since dead, said in life. No written line is to be found, except in the questioned instrument itself, in which the decedent gave any expression to the state of mind which the several witnesses say he revealed orally to them. The few letters he wrote to the plaintiff do not support the claim. They are brief and formal and have to do with com-

monplace matters, and refer principally to his preparation for his return journey to Los Angeles. The fact that he did go to Europe without the company of the plaintiff, and continued to do so in 1928, 1929, 1930, and 1931 with Dr. Foster as his companion, and the further fact that the plaintiff moved from her room directly opposite to his to a different floor, and the significant fact that the colonel left the Engstrum Apartments a few days after October 10, 1927, and the close personal relations claimed to have theretofore existed became severed from that time forward, which is also true as to every one of the coterie who testified in her behalf, are wholly incompatible with the relation of benefactor and benefactress. After October 10, 1927, those who claimed to have been deeply concerned in his welfare seemed, for some reason, to have lost interest in him. Some never again saw him, although he lived four years thereafter. There is no doubt that Mrs. Herbert was, as were her lady companions, a frequent theater and dinner guest of his and that she partook of his hospitality in large measure and in turn made herself agreeable to him. By her creditor's claim, however, and the testimony of Miss Blood and other companions, it is contended she was in his employ in some capacity, her exact duties not being clearly defined. No serious claim is made that she was his nurse, and, conceding that she did all that is claimed, the service does not by any means assume the character of hourly, daily, weekly or monthly employment, and at the most it was spread over a period of two years. No person connected with the Biltmore Hotel, where he lived when in the state during the full period covered by this inquiry, and who should have been able to support plaintiff's claim of service, the burden being upon her, was called upon to testify in her behalf, and such evidence as was given on the subject would exclude her from the role of an employee of a servile or domestic type. Her bills at the Engstrum, at the Biltmore, for theater tickets, dinners, automobile and taxi transportation; expenses to Vancouver, New York, Palm Springs, and every place where she or her friends accompanied the colonel, and every known charge, were paid by him. Certain portions of her diary were admitted in evidence and the entries made by her with respect to the Vancouver trip showed beyond question that she traveled as a first-class passenger and performed no services that would reduce her to the rank

of a servant. She indulged in all the luxuries enjoyed by persons traveling on first-class trains or steamers and spent much of her leisure in playing the ukulele and engaging in social functions. No item recorded by her in her diary would indicate that she was rendering services for pay, but it amply appears that she was having an exceedingly enjoyable time, attending theaters, enjoying good dinners and staying at first-class hotels. When she accompanied the colonel to New York, her former home, she remained there a number of days, visiting with her close friend, Adele Blood Hope, and this trip and visit was one of pleasure.

Mrs. Herbert was or had been a married woman, but whether she was a widow or divorced from her husband does not appear. There is some evidence in the case that they were seen together in 1924 or 1925, but all attempts to describe their marital relations were met with objections sustained. Likewise, objection was sustained to an attempt to show that she had been previously married. No background of her past is given, except as shown by the fragmentary references herein recorded.

We have stated the evidence as strongly in plaintiff's favor as the record will warrant and we have made an extended review of the evidence because of the often applied rule that an appellate court will not interfere with the judgment entered by a fact-finding body when there exists a substantial conflict in evidence. This rule, however, does not relieve an appellate court of its duty of analyzing the evidence in the light of reason and human experience and giving consideration to the motives and propensities which tend to influence or prompt human action, in an effort to solve the question as to whether the judgment is reasonably and substantially sustained by the evidence.

In a consideration of the question as to whether or not there exists a substantial conflict, the fact that the consideration passing from the decedent to the plaintiff was so grossly disproportionate, as the books put it, as to shock the conscience of all men, cannot be laid out of the case; nor can the confidential relations that existed between the parties, in the absence of evidence of independent advice, be disregarded. There must be more than a conflict of mere words to constitute a conflict of evidence. The contrary evidence must be of a substantial character, such as reason-

ably supports the judgment as applied to the peculiar facts of the case. The rule announced in *Morton* v. *Mooney et al.,* 97 Mont. 1 [33 Pac. (2d) 262], correctly states the rule which has been approved by this court in a number of our decisions. It is thus stated:

"While the jurors are the sole judges of the facts, the question as to whether or not there is substantial evidence in support of the plaintiff's case is always a question of law for the court (*Grant* v. *Chicago etc. Ry. Co.,* 78 Mont. 97 [252 Pac. 382], and in determining this question 'the credulity of courts is not to be deemed commensurate with the facility and vehemence with which a witness swears. "It is a wild conceit that any court of justice is bound by mere swearing. It is swearing creditably that is to conclude the judgment." ' "

The rule in cases such as the one before us is that the court must view the transaction with the "most scrutinizing jealousy". This means, of course, any court in which the issue may be raised. Oral evidence, of which there is no satisfactory independent corroboration, is the weakest kind of evidence known to the law. In *Smellie* v. *Southern Pac. Co.,* 212 Cal. 540 [299 Pac. 529], this court, in considering the same kind of evidence upon which plaintiff must rely in the instant case, said:

" 'Evidence of the declarations or oral admissions of a party are always received with caution. (Code Civ. Proc., sec. 2061, subd. 4.) . . .

" 'A third inherent weakness to be found in the testimony of Ireland is that it purports to give the statements or declarations of a deceased person. Regarding testimony of this character, this court said: "The evidence is of oral admissions against interest by a man whose lips are sealed in death. What, then, does the law say of such evidence (assuming now its admissibility)? The Code of Civil Procedure declares (sec. 2061, subd. 4) that 'the evidence of oral admissions of a party ought to be received with caution by a jury'. In *Mattingly* v. *Pennie,* 105 Cal. 514 [45 Am. St. Rep. 87, 39 Pac. 200], this court in bank said, 'No weaker kind of testimony could be produced.' Again in bank (*Austin* v. *Wilcoxson,* 149 Cal. 24 [84 Pac. 417], this court has said: 'It is not stating it too strongly to say that evidence so given under such circumstances must appear to any court to be

in its nature the weakest and most unsatisfactory.' '' *Estate of Emerson,* 175 Cal. 724, 727 [167 Pac. 149, 151].) We might go on and cite many other authorities, but the above are sufficient for our present purpose.' ''

The only evidence introduced by plaintiff is that given by persons who unquestionably were active participants in an effort, through a long period of time, to induce the decedent by means shown by the record to make the plaintiff a beneficiary of his estate. That such was the purpose is too plain to require argument. He was actually taken to task by Adele Blood Hope on at least one occasion for having failed to comply with her suggestion made to him as to what she thought was a suitable provision for him to make for plaintiff. Every means that was thought likely to accomplish that end was brought to bear upon decedent. That there was concert of action on the part of plaintiff and her companions is all but admitted by them. The pressure was intensely applied beginning with the New York trip and was increased by the subsequent Vancouver and Palm Springs trips and finally spent its force at the Engstrum Apartments on October 10, 1927, or shortly thereafter, when the parting of the ways followed whatever transaction took place on that day. The story of a transaction involving the transfer by said instrument to the enrichment of the plaintiff in the sum of $500,000, in the circumstances related by plaintiff and her witnesses, not only strains the credulity of those expected to accept it, but it would seem to bring into serious question the normal mental condition of a former successful business man who engaged in such a transaction. The contention that the decedent had no independent advice in the matter, especially during the few weeks immediately prior to the transaction, when he was under the surveillance of Mrs. Herbert and her companions at the Engstrum, is rendered probable by plaintiff's witnesses, Miss McKee and Miss Blood. The colonel advised Mrs. Herbert, as he delivered the note to her, to deposit it in the bank, and, after his death, to take it to Mr. Macdonald and he would see that it was paid. Mr. Macdonald had no knowledge of the note until after the colonel's death. Miss Blood testified that the colonel said to her that his only regret was that he would not be able to see Mr. Macdonald's face when the note would come to his attention.

From what has been heretofore said in the review and analysis of the case, the transaction related by plaintiff's witnesses from its genesis to its close cannot be easily explained on any theory consistent with ordinary human action.

The testimony of the only person who claimed to have witnessed the transaction is to the effect that the instrument was the product of one continuous writing operation. This testimony is weakened by the physical facts which appear on the face of the note. It does not require the assistance of an expert to discern them. In addition to the physical facts already pointed out, and which tend to nullify Miss McKee's testimony in material respects, the fifth cipher in "$500,000" is out of line with the third and fourth ciphers, and it is relatively smaller and was evidently blotted. The inserted words "One month" were also evidently blotted. The letter "h" intersects the letter "e" in the word "hundred" just above it. No blotter was used to absorb the ink after writing the word "hundred". The only words or figures which show the use of a blotter at all are "one month" and the fifth cipher. The "after death" clause rendered the note nonnegotiable and therefore postponed an investigation as to its genuineness until after the death of Colonel Lankershim. If a blotter had been used at the time the body of the instrument was written, absorption would have shown in the words adjoining and immediately above and in close proximity to the blotted words. On the contrary, all other writing shows quite black and heavy. If the writing was a continuous process, the ink must have been wet in "hundred" when the blotted words were written and, if so, the extension of the letter "h" into the letter "e" would have produced the usual effect of blurring or running together of the ink. Instead, the letter "e" has the appearance of having been completely dried at the time the letter "h", from underneath, intersected said letter "e". The written words "thousand dollars" have a decided variance in slant of letters from the letters in the preceding words, showing a different writing position. Features upon the face of the instrument give the appearance of alterations made after its execution, noticeably the forcing out of line of the word "me" to avoid writing into the letter "J".

Plaintiff meets this criticism by saying that it was done to avoid writing into the bracket at the end of a ruled line. Appellants respond by pointing out that printed mat-

ter, including border lines, did not stay the hand of the writer. The note speaks for itself. The burden of establishing its integrity was upon plaintiff. No evidence was given as to any changes or alterations made in the instrument after it was written except the testimony of Miss McKee. She saw no blotter used in the production of the instrument, or at all, and the note was flat and had not been folded when she examined it. Its physical appearance indicates that it had been folded before written upon. Her testimony in other respects has been analyzed. Three experts on penmanship and one on analytical chemistry, two of whom were selected by the court, made critical examinations of the document and all are of the opinion that the signature of the decedent and the body of the instrument were written with different inks and at different times. It is insisted that the testimony of said experts is corroborated in several respects by physical facts. ■ The rule is that expert evidence, like other kinds, cannot be arbitrarily disregarded.

■ The rule as to the adequacy of consideration is well stated in 13 Corpus Juris, sections 237, 238, as follows: ''So long as it is something of real value in the eye of the law, whether or not the consideration is adequate to the promise is generally immaterial in the absence of fraud. . . . the inadequacy, as has been well said, is for the parties to consider at the time of making the agreement, and not for the court when it is sought to be enforced. It is competent for the parties to make whatever contracts they may please, so long as there is *no fraud* or deception or infringement of law. Hence the fact that the bargain is a hard one will not deprive it of validity.'' However, this is by no means an inflexible rule, but has exceptions well recognized in the decisions of many of the leading states of the Union, including decisions of the United States Supreme Court. The exceptions exist ''where the inadequacy is so gross as to shock the conscience and common sense of all men, it may amount both at law and in equity to proof of fraud, oppression and undue influence. So, while it is ordinarily stated to be the rule at law that the adequacy of consideration is not material, a court of law, where the contract is unreasonable and unconscionable, may give a party who sues for the breach, not what the other party promised to pay, but only what plaintiff is honestly and equitably entitled to.'' This rule of equity strongly appeals to the common sense of justice. ■ Section 239

of the above text, citing authority sustaining the principle announced, states the rule to be that "inadequacy of consideration is often treated *as corroborative evidence of fraud or undue influence* which will enable a promisor to resist a suit for specific performance or have his agreement set aside. Where mental weakness occurs in connection with inadequacy of consideration, the presumption of undue influence becomes very strong. Again, where the parties stand in a *confidential relation,* inadequacy of price will raise a *presumption of fraud.*" (Italics ours.) Inadequacy of consideration may be so excessively gross and unconscionable as to amount to conclusive evidence of fraud. Gross inadequacy of consideration is, therefore, to be considered together with the evidence bearing upon the *bona fides* of the transaction. This rule better conforms to the more modern and common sense concept of fair and honest dealing. Any other rule would be abhorrent to that sense of justice which finds approval in our best judicial pronouncements.

In the state of the evidence in this case it is a very serious question whether, as a matter of law, the evidence adduced by the plaintiff is sufficiently substantial to support the judgment. In cases in which a serious doubt is created in the mind of the reviewing court as to the sufficiency of the evidence to support the judgment, it becomes the duty of the court to consider carefully the errors complained of, and if it should appear upon such consideration that the errors committed probably prejudiced the case of the party against whom they were committed, it is the duty of the court to order a retrial of the cause. In such cases the provisions of article VI, section $4\frac{1}{2}$ of the Constitution cannot be invoked in aid of the affirmance of the judgment, unless it can be said that the justice of the cause preponderated so heavily on the side of the prevailing party that none of such errors did or could have contributed to or resulted in a miscarriage of justice. Construing article VI, section $4\frac{1}{2}$ of the Constitution, this court, in *People* v. *Davis,* 210 Cal. 540, 556 [293 Pac. 32], said: "The phrase 'miscarriage of justice' used as descriptive of that condition of a cause which justifies the reversal of a judgment, has no hard and fast definition. It seems assured, however, that where errors have been committed, and where the appellate court finds that upon the record it is seriously doubtful that without such errors the defendant would have been convicted,

then it may well be that errors which otherwise would not be considered to be seriously prejudicial, will require a reversal.'' The rule applies to civil as well as to criminal cases. (*Tower* v. *Humboldt Transit Co.,* 176 Cal. 602, 605 [169 Pac. 227]; *Langford* v. *San Diego El. Ry. Co.,* 174 Cal. 729 [164 Pac. 398]; *Citti* v. *Bava,* 204 Cal. 136, 138 [266 Pac. 954]; *Squires* v. *Riffe,* 211 Cal. 370, 374 [295 Pac. 517]; *People* v. *Washburn,* 104 Cal. App. 662 [286 Pac. 711, 714].)

Under the doubtful state of the evidence, we are of the view that the case should be reversed for reasons already pointed out and hereafter to be considered.

If the note was intended as a gift payable after death, then, of course, it did not create an enforceable legal obligation. (*Coon* v. *Shry,* 209 Cal. 612 [289 Pac. 815]; *Tracy* v. *Alvord,* 118 Cal. 654 [50 Pac. 757]; *Wisler* v. *Tomb,* 169 Cal. 382 [146 Pac. 876].) The note can be upheld, if at all, only as a contract. This is conceded. As a contract, to be enforceable, it must, of course, be supported by a valid consideration. This consideration must be either past or present.

As part of her case respondent offered evidence tending to prove various services intermittently rendered by her, and the length of time over which the services were rendered. According to the evidence produced by her, all of the services were rendered and completed prior to the date of the execution of the note. There is not one word of evidence that services of any kind were rendered after that date. If the note was intended as compensation for the services already rendered, then the provisions of section 1606 of the Civil Code are applicable, and this is so whether the obligation to pay for these past services was either a moral or a legal obligation. That section provides: ''An existing legal obligation resting upon the promisor, or a moral obligation originating in some benefit conferred upon the promisor, or prejudice suffered by the promisee, is also a good consideration for a promise, *to an extent corresponding with the extent of the obligation, but no further or otherwise.*'' (Italics supplied.)

It must be admitted that, under this theory, at the time the note was executed the ''extent of the obligation'' existing against Colonel Lankershim, legally or morally, was to pay for the reasonable value of the services rendered. If this analysis is correct, then the only consideration that can support

the document sued upon was this prior obligation, and it can support the document only to the "extent of the obligation, but no further or otherwise." ▮ The appellants sought to introduce evidence as to the reasonable value of the services, but this evidence was excluded. The jury was specifically instructed that the respondent, if entitled to recover at all, was entitled to recover the full $500,000. The defendants offered several instructions to the effect that if the jury should find the consideration for the note was past consideration, then the plaintiff was limited in her recovery to the reasonable value of her services. These instructions were refused. This was error of a prejudicial nature. Certainly from the evidence introduced, the jury, if it found services were in fact rendered could have found that the services already rendered when the note was executed were the sole consideration for the note. The jury should have been instructed that, in the event it so found, recovery was limited to the extent of the existing obligation as defined in section 1606 of the Civil Code. (*Lagomarsino* v. *Giannini*, 146 Cal. 545 [80 Pac. 698]; *Estate of McConnell*, 6 Cal. (2d) 493 [58 Pac. (2d) 639]; *Benjamin Moore & Co.* v. *O'Grady*, 9 Cal. App. (2d) 695 [50 Pac. (2d) 847].)

▮ Appellants make complaint that the value of the testimony of the expert witnesses was greatly weakened, if not destroyed, by the many objections made by respondent and, as they contend, improperly sustained. It is also insisted with some force that the examination of these witnesses was unduly curtailed and frequently interrupted by objections which should not have been allowed to the extent that it seriously prejudiced appellants' cause with the jury. That many of the objections were placed on highly technical, if not insubstantial, grounds is not entirely without support. The specific grounds of the objections were that the questions called for the conclusions or inferences of the witnesses or carried them into the realms of speculation or permitted them to make deductions and resort to the inductive method of arriving at conclusions. An examination of the record convinces us that the examination of the opinion witnesses was too narrowly limited. A number of the objections sustained on the grounds stated were not well taken, as the questions called for the opinions of the witnesses on matters within the field of this class of evidence. It may be properly said that ruling upon the admission of such testimony in the

course of trial often presents perplexing problems to a trial court.

H. O. Moulton, who had been the bookkeeper in the Lankershim Estate Corporation for a number of years, testified on behalf of defendants as to the failing eyesight of decedent, his manner of signing his name, and as to his traits and his general physical condition. During his examination he said that he had to do, in his employment, with keeping records of all of decedent's properties and that he was familiar with said properties. This designation of duties, plaintiff claimed, opened the door for cross-examination as to his wealth and entitled plaintiff to a listing of all the properties of whatsoever kind owned by decedent in 1927. Accordingly, over the objection of appellants, the witness was directed to furnish lists setting out all real and personal property, including stocks, bonds, and all evidences of debt owned by him. The witness, under the ruling, testified that decedent owned all but two shares of the Lankershim Estate Corporation, the authorized capital of which was $1,000,000. A list of real estate, stocks and bonds covering approximately six printed pages was read into the record. The *par* value aggregated $1,012,923.31. The market value was not given. This evidence near the close of the case was stricken out as being inadmissible. Upon several occasions during the trial the plaintiff brought to the attention of the jury that Colonel Lankershim was a very wealthy man. This matter was made to appear, by inference, on the cross-examination of witness Sellers, by questions as to the compensation he was to receive. The cross-examination of Dr. Kress, the eye specialist who treated the colonel, did not relate to any matter about which he testified in chief, but had to do with the fees which the oculist had charged him. Without any apparent ground to prompt the question, Miss Tufts, secretary of the Lankershim Corporation, was asked if she had ever read to the colonel a letter written by Mrs. Lankershim to her husband in which she signed herself "millionairess". No offer was made to prove that she had written such a letter. Taking into consideration the nature of the action, it is not likely that the jury was able to entirely shut out of mind the long list of real properties, certificates of stocks, bonds, and evidences of wealth which had been read to them. Both counts of the complaint specifically alleged the performance of *service* as the foundation of the action.

The proffered testimony of defendants as to certain declarations made by plaintiff which tended to rebut the testimony of plaintiff's witnesses given to the effect that she was kind to, sympathetic with, and considerate of the colonel, and was committed to his financial and personal welfare should not have been excluded from the jury's consideration, especially in the face of the fact that plaintiff greatly stressed this particular issue. It was proper evidence both as rebuttal and as going to the plaintiff's state of mind.

A number of other assignments of error are argued by appellants, but we do not deem it necessary to go further than to consider certain instructions requested by appellants and refused by the court.

The important issues tendered by the answer were fraud, undue influence, the weakened condition of decedent by age, and the gross inadequacy of the consideration. Appellants prepared and offered a number of instructions setting forth their several defenses which were calculated to give the jury a full understanding of the issues involved in the case and the rules of law applicable to the issues as framed by appellants. These requested instructions which had to do strictly with undue influence and inadequacy of consideration were all refused and no equivalent instructions were elsewhere given. Unless the pleadings were read to the jury —and it does not appear that they were—the jury would not have definite or sufficient information as to all the vital matters of defense pleaded by appellants.

The consequent duties and obligations which the law imposes, in a case where a confidential relation is shown to exist, upon a person who greatly advantages in treating with a confiding person, is nowhere fully or adequately stated. The only instructions given at the request of appellants in which the subject "confidence" reposed in another is mentioned are instructions No. 70 and No. 75. All others were refused. The ones given in no way informed the jury as to the *effect* of such relations or the rules of law to be applied in such cases, but merely enumerated some of the things that may properly be considered in determining whether such relations exist. The only references made to the subject in the instructions given at the request of plaintiff are to be found in instructions No. 3, No. 11, No. 11 (a), No. 11 (c), No. 11 (b), and No. 13. Instruction No. 3 threw the burden unqualifiedly on appellants. No. 11 did likewise.

By No. 11 (a) the jury was told that a confidential relation does not in and of itself raise any presumption of fraud or undue influence unless it is also established by a preponderance of the evidence that such confidential relation was actually used to obtain an unfair advantage. By instruction No. 11 (b) the jury was told that the proof of undue influence must be substantial to the effect that pressure was used which overpowered the volition of the party upon whom it operated, and that it must amount to more than a suspicion. No. 13 merely mentioned "undue influence" in a negative way and did not purport to throw any light on the law applicable to confidential relations. This covers every reference made to the subject of confidential relations, and no sufficient instruction was given on the subject of gross inadequacy of consideration. These two major defenses, therefore, were not adequately called to the consideration of the jury. The defendants stressed both issues by a number of instructions which were rejected. ▮▮ By instructions No. 3 and No. 11, given at plaintiff's request, the jury was told that the burden of proving undue influence by a preponderance was upon the defendants. The general rule is that the burden is on the party who introduces affirmative matter. The instructions, however, made no exception as to the burden shifting to the trustee to show that the transaction was fair, free from fraud or undue influence, if a confidential relation is shown to exist and the transaction as to the confiding party was inequitable and the consideration was grossly inadequate. It is conceded that plaintiff wrote the entire instrument, except the signature, which she seeks by her action to enforce. ▮▮ The line of authorities is unbroken to the effect that where a confidential relation exists and one of the parties to the relationship has shown great activity in procuring the execution of the instrument by which he or she greatly benefits by the transaction, the activity of such person becomes an important factor for the court or jury to consider in determining whether the transaction was free from undue influence. If such relations are found to exist the burden of showing that no undue advantage was taken shifts to the other side (*Estate of Lances*, 216 Cal. 397 [14 Pac. (2d) 768] ; *Estate of Yale*, 214 Cal. 115 [4 Pac. (2d) 153] ; *Estate of Nutt*, 181 Cal. 522 [185 Pac. 393].) Several instructions

containing these propositions of law were asked but all were rejected.

 Appellants set out in their briefs some fifty requested instructions, a number of which they vigorously urge should have been given and it constituted reversible error to refuse them. Among this number, which bore upon the fundamental issues of law presented by the defense, and which appellants specially urge, are Nos. 40, 69, 71, 72, 73, and 74. Space will not permit a reproduction of all of the rejected instructions and we will set forth but two as typical, in a general way, of the others. Instruction No. 40 reads: "The plaintiff's action in this case is based upon the documents herein sued upon. The defendants have pleaded, among other defenses, that the consideration for this document, if any, was grossly inadequate. Defendants also claim, as one of their defenses, that the said document was fraudulently obtained by the plaintiff from Colonel J. B. Lankershim. I instruct you that it is the law that a presumption of fraud arises where there is a great disparity between the value of services rendered and the recompense, and a confidential relation exists between the parties, and the party promising to pay has had no independent advice and has relied upon the beneficiary named in the preparing of the document signed by him, and the beneficiary under the document writes the entire body of the document in her own hand. It is for you to determine from the evidence if the different factors set out existed at the time it is alleged the document herein sued upon was made (if you find it to have been made)." ·

None of the instructions gave consideration to independent advice as an issue in cases in which confidential relations are alleged, nor on the important matters mentioned herein. The instruction would have been freer of criticism had it read: "A presumption of undue influence" rather than a "presumption of fraud". In the interest of a full and complete understanding of the law applicable to the case it was necessary that the jury be instructed on the major subjects raised by the pleadings even if a modification in this or other respects was required to make a more acceptable presentation of the law. We think this is the rule approved by statute and judicial decision where fundamentals are involved, there being no attempt on the part of the author to

mislead the court or jury by resorting to equivocally or ingeniously phrased requests, especially in cases where the jury otherwise would be left uninstructed on vital issues of the case.

Instruction No. 72 is more comprehensive and reads: "The law defines a confidential relation as any relation existing between parties to a transaction wherein one of the parties is in duty bound to act with the utmost good faith for the benefit of the other party. Such a relation ordinarily arises where a confidence is reposed by one person in the integrity of another, and in such a relation the party in whom the confidence is reposed, if he voluntarily accepts or assumes to accept the confidence, can take no advantage from his acts relating to the interest of the other party without the latter's knowledge or consent. A fiduciary relation in law is ordinarily synonymous with a confidential relation. It is also founded upon the trust or confidence reposed by one person in the integrity and fidelity of another, and likewise precludes the idea of profit or advantage resulting from the dealings of the parties and the person in whom the confidence is reposed. If, therefore, from all the evidence in this case, you find that the relations between Colonel J. B. Lankershim and the plaintiff were such that Colonel Lankershim reposed confidence in the integrity or fidelity of plaintiff, and relied upon plaintiff in the transaction involved, and that plaintiff voluntarily accepted or assumed to accept such confidence, then you must find that a confidential relation existed between Colonel J. B. Lankershim and plaintiff. Where such a confidential relation exists, the law views with strictness the business dealings of the one in whom the confidence is reposed to show that the other party to the relation acted voluntarily with a full knowledge of all the facts and that the transaction was fair and just. If, therefore, you find from all the facts of this case that a confidential relation did in fact exist between Colonel J. B. Lankershim and the plaintiff at the time of the execution and delivery of the document here sued upon (if it was executed and delivered) the burden is upon plaintiff of showing that the transaction was fair and just and fully understood and consented to by Colonel J. B. Lankershim, and unless you find that plaintiff has shown the transaction to have been of this character, your verdict must be for the defendants."

The above proffered instruction, as well as several others, seems to be a sound exposition of the law on the subjects of which they treat and such instructions were essential for the jury's guidance as to the effect and sufficiency of the evidence. The jury should have been given full instructions as to the principle which several of them enumerated. Further, they should have been given in view of certain instructions given at the request of plaintiff, which have already received attention. The importance of the jury being fully instructed as to the inadequacy of consideration in a case of this nature is made pertinent by the following excerpt from *Odell* v. *Moss,* 130 Cal. 352, 358 [62 Pac. 555], supported by ample authority.

"There was no consideration, or at least no adequate consideration, for the deeds, and, from this alone, the presumption of undue influence arises. The case is one of that class of bargains that are said to be 'of such an unconscionable nature and of such gross inequality as naturally leads to the presumption of fraud, imposition, or undue influence; . . . such bargains as no man in his senses, and not under delusion would make on the one hand, and as no honest and fair man would accept on the other, being inequitable and unconscionable bargains'. (1 Story's Equity Jurisprudence, sec. 244, et seq.) . . . " (*Allore* v. *Jewell,* 94 U. S. 506 [24 L. Ed. 260]; *Hume* v. *United States,* 132 U. S. 406 [10 Sup. Ct. 134, 33 L. Ed. 393]; *Bassick* v. *Aetna Explosives Co.,* 246 Fed. 974.)

Respondent takes the position that the judgment may be sustained on the theory of novation or account stated. Neither theory was presented by pleading, or raised during the trial by evidence directed to the issues, or by any request for instructions framed to elucidate said theories. This precludes respondent from arguing these new theories on appeal.

The judgment is reversed.

Langdon, J., Curtis, J., Shenk, J., and Waste, C. J., concurred.

Edmonds, J., being disqualified, did not participate in the consideration or decision of this case.

Rehearing denied.